UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE ASSAD, Derivatively on Behalf of INTELLIGENT SYSTEMS CORPORATION,<br><br>                              Plaintiff,<br><br>        v.<br><br>J. LELAND STRANGE, MATTHEW A. WHITE, PHILIP H. MOISE, A. RUSSELL CHANDLER, III, KAREN J. REYNOLDS, BONNIE L. HERRON, JAMES V. NAPIER, PARKER H. PETIT, and CHERIE M. FUZZELL,<br><br>                              Defendants,<br><br>        -and-<br><br>INTELLIGENT SYSTEMS CORPORATION, a Georgia corporation,<br><br>                Nominal Defendant. | Case No.<br><br>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT<br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Intelligent Systems Corporation ("Intelligent Systems" or the "Company") against certain of its officers and directors for violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment. These wrongs resulted in hundreds of millions of

dollars in damages to Intelligent Systems' reputation, goodwill, and standing in the business community. Moreover, these actions have exposed Intelligent Systems to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Defendant J. Leland Strange ("Strange") has controlled the Company for most of its history. Defendant Strange has served as Intelligent Systems' President since 1983, and Chief Executive Officer ("CEO") and Chairman of the Company's Board of Directors (the "Board") since 1985. Defendant Parker H. Petit ("Petit") established a friendship with defendant Strange that began before he was appointed to the Company's Board in 1996, and strengthened throughout the years. This relationship obstructed the Board's oversight, which was already hampered by its small size. Only four directors have been on the Board since 2016, including defendant Strange and, until August 2019, also defendant Petit.

3.      Due to defendants Strange and Petit's close relationship and because the Board lacked a majority of independent directors, defendant Petit was allowed to remain on the Board even though he is a noted fraudster unfit to serve as a fiduciary of any publicly traded company. Defendant Petit has inflicted corporate trauma upon several companies under his management. Publicized governmental investigations and lawsuits were brought against at least three companies in which defendant Petit played a major role. Defendant Petit's fraud and wrongful behavior has been so egregious that his mere association with Intelligent Systems threated the Company's reputation and exposed it to liability risks. Defendant Strange even admitted during a June 5, 2019 conference call that he was aware short sellers would turn their attention to Intelligent Systems because of its relationship with defendant Petit. Despite this knowledge, the Individual Defendants (as defined herein) allowed defendant Petit to continue serving not only on the Board, but also on the Audit Committee.

4.       Defendant Petit's service on the Board and Audit Committee predictably resulted in Intelligent Systems disseminating a series of improper statements.  In particular, between May 24, 2014 and May 29, 2019, the Individual Defendants claimed defendant Petit qualified as both an "independent" director and as a "financial expert" when, in reality, his undisclosed ties to defendant Strange and the pervasive accounting fraud he effectuated at other companies meant he was neither.  These fiduciaries failed to disclose several related-party transactions in violation of U.S. Generally Accepted Accounting Principles ("GAAP").  Other companies connected to defendant Petit had made similar misstatements.

5.       Moreover, certain of the Director Defendants (as defined herein) issued materially misleading Proxy Statements.  In particular, on April 5, 2017, certain Director Defendants issued a Proxy Statement (the "2017 Proxy") urging stockholders to reelect defendant Petit to serve on the Board until the 2020 Annual Meeting of the Shareholders.  The 2017 Proxy claimed defendant Petit was more than qualified to serve on the Board by touting his independence and experiences at other companies while failing to disclose his ties to defendant Strange and omitting the frauds he perpetrated against other companies.  Similarly, on April 2, 2018, certain Director Defendants issued a Proxy Statement (the "2018 Proxy") asking stockholders to reelect defendant Strange to serve on the Board until the 2021 Annual Meeting of the Shareholders.  As before, the 2018 Proxy failed to disclose defendant Strange's ties to defendant Petit.  In addition, it failed to disclose that defendant Strange also had an undisclosed personal relationship with the Company's "independent" auditor.  Had the stockholders known the truth about defendant Petit's improprieties and defendant Strange's personal ties to defendant Petit, as well as the independent auditor, they would have rejected the Board's recommendations.  The 2017 Proxy and 2018 Proxy thus facilitated improper conduct detailed herein and resulted in the damage that

inevitably ensued.

6.     On May 24, 2019, a short seller known as Aurelius Value issued a report titled "INS: A Wolf in Pete's Clothing" that criticized defendant Petit's continued service on the Company's Board and exposed numerous undisclosed personal entanglements.   The report explained that the Individual Defendants were "[f]arcically" characterizing defendant Petit as the "financial expert" of the Audit Committee "even though he orchestrated a giant fraud at MiMedx that has thus far cost investors over $1.5 Billion in losses."   Among other previously concealed connections, the report revealed for the first time defendant Strange's undisclosed relationships with defendant Petit and the Company's "independent" auditor.

7.     On the news of the Aurelius Value report, Intelligent Systems' stock fell 18%, or $7.17 per share, on May 28, 2019, to close at $31.94 per share compared to closing at $39.11 per share on May 23, 2019, erasing over $63 million in market capitalization.

8.     More damaging news came to light on May 30, 2019, as Grizzly Research LLC ("Grizzly Research")   issued a report titled "Intelligent Systems Corp: Material Undisclosed Related Party Transactions Cast Doubt on the Integrity of Financial Statements."   The report focuses on the Company's transactions with Indian companies while setting forth evidence demonstrating that the Company either engaged in round-tripping or siphoned off money to related parties.

9.     Following the Grizzly Research report's publication, the Company's stock plunged more than 24%, or $8.21 per share, on June 3, 2019, to close at $25.60 per share compared to closing at $33.81 per share on May 29, 2019, erasing over $72 million in market capitalization.

10.     Further, as a direct result of the improper statements detailed herein, Intelligent Systems is now the subject a federal securities class action lawsuit filed in the U.S. District Court

for the Eastern District of New York on behalf of investors who purchased Intelligent Systems' shares (the "Securities Class Action").

11.     On July 23, 2019, pursuant to Georgia law, plaintiff sent a letter to Intelligent Systems' Board demanding them to investigate and remedy the foregoing facts arising from the letter and to commence litigation against the corporate fiduciaries responsible for damaging the Company (the "Demand").   Plaintiff made the Demand over ninety days ago and has not received notice of any rejection.   Further, limited correspondence plaintiff has had with the Company is already enough to doubt the Board's ability to independently and impartially consider the Demand.   In particular, the Board's counsel is conflicted because it is representing the Company and certain of the Individual Defendants in the Securities Class Action. Accordingly, plaintiff brings this action to timely address the wrongdoing discussed herein.

## JURISDICTION AND VENUE

12.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367. Jurisdiction is also conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

13.     Venue is proper in this Court because a portion of the transactions and wrongs complained of herein occurred in this County, and defendants have received substantial compensation in this County by doing business here and engaging in numerous activities that had an effect in this County.

14.     In connection with their acts and conduct detailed herein, defendants used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephonic communications and the facilities of the national securities exchange.

## THE PARTIES

**Plaintiff**

15.     Plaintiff Geroge Assad was a stockholder of Intelligent Systems at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Intelligent Systems stockholder.  Plaintiff is a citizen of Massachusetts.

**Nominal Defendant**

16.     Nominal Defendant Intelligent Systems is a Georgia corporation with principal executive offices located at 4355 Shackleford Road, Norcross, Georgia.  Accordingly, Intelligent Systems is a citizen of Georgia.   Intelligent Systems, through its wholly owned subsidiary CoreCard Software, Inc. ("CoreCard"), provides technology solutions and processing services to the financial technology and services ("FinTech") market in the United States and European Union.  The Company's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "INS."  As of February 15, 2019, the Company had 430 full-time employees.

**Defendants**

17.     Defendant Strange is Intelligent Systems' President and has been since 1983 and CEO and Chairman of the Board and has been since 1985.  Defendant Strange was Intelligent Systems' Chief Financial Officer ("CFO") from November 1991 to October 1995.  Defendant Strange is named as a defendant in a related securities class action amended complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5

promulgated thereunder.  Defendant Strange knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the qualifications, independence, and personal entanglements of the Company's fiduciaries; and (ii) Intelligent Systems' related-party transactions.  In addition, defendant Strange negligently made misleading statements and omissions in the 2017 Proxy concerning defendant Petit's qualifications and independence and in the 2018 Proxy concerning defendant Strange's independence.  Intelligent Systems paid defendant Strange the following compensation as an executive:

| Year | Salary | Bonus | Other Annual Compensation | Total |
|------|--------|-------|---------------------------|-------|
| 2018 | $300,000 | $245,000 | $4,125 | $549,125 |
| 2017 | $300,000 | - | $4,050 | $304,050 |
| 2016 | $300,000 | - | $3,975 | $303,975 |
| 2015 | $311,538 | $200,000 | $3,975 | $515,513 |
| 2014 | $295,385 | - | $3,900 | $299,285 |

Defendant Strange is a citizen of Georgia.

18.     Defendant Matthew A. White ("White") is Intelligent Systems' CFO, Vice President, and Corporate Secretary and has been since January 2019.  Defendant White is named as a defendant in a related securities class action amended complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder. Defendant White knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the qualifications, independence, and personal entanglements of the Company's fiduciaries; and (ii) Intelligent Systems' related-party transactions.  Defendant White is a citizen of Georgia.

19.     Defendant Philip H. Moise ("Moise") is an Intelligent Systems director and has been since May 2013.  Defendant Moise is a member of the Audit Committee and has been since at least April 2014.  Defendant Moise is named as a defendant in a related securities class action

amended complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  Defendant Moise knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the qualifications, independence, and personal entanglements of the Company's fiduciaries; and (ii) Intelligent Systems' related-party transactions.  In addition, defendant Moise negligently made misleading statements and omissions in the 2017 Proxy concerning defendant Petit's qualifications and independence and in the 2018 Proxy concerning defendant Strange's independence.  Intelligent Systems paid defendant Moise the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Option Awards | Total |
|------|------------------------------|---------------|-------|
| 2018 | $16,000 | $19,457 | $35,457 |
| 2017 | $16,000 | $9,340 | $25,340 |
| 2016 | $16,000 | $9,760 | $25,760 |
| 2015 | $16,000 | $8,400 | $24,400 |
| 2014 | $16,000 | $4,240 | $20,240 |

Defendant Moise is a citizen of Georgia.

20.     Defendant A. Russell Chandler, III ("Chandler") is an Intelligent Systems director and has been since September 2017.  Defendant Chandler is Chair of the Company's Audit Committee and has been since September 2017.  Defendant Chandler is named as a defendant in a related securities class action amended complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  Defendant Chandler knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the qualifications, independence, and personal entanglements of the Company's fiduciaries; and (ii) Intelligent Systems' related-party transactions.  In addition, defendant Chandler negligently made misleading statements and omissions in the 2018 Proxy concerning defendant Strange's independence.  Intelligent Systems paid defendant Chandler the

following compensation as a director:

| Year | Fees Earned or Paid in Cash | Option Awards | Total |
|------|------------------------------|----------------|--------|
| 2018 | $16,000 | $19,457 | $35,457 |
| 2017 | $4,000 | $11,700 | $15,700 |

Defendant Chandler is a citizen of Georgia.

21.     Defendant Karen J. Reynolds ("Reynolds") was Intelligent Systems' CFO, Vice President, and Corporate Secretary from June 2016 to January 2019.  Defendant Reynolds is named as a defendant in a related securities class action amended complaint that alleges she violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  Defendant Reynolds knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the qualifications, independence, and personal entanglements of the Company's fiduciaries; and (ii) Intelligent Systems' related-party transactions.  Intelligent Systems paid defendant Reynolds the following compensation as an executive:

| Year | Salary | Option Awards | Other Annual Compensation | Total |
|------|--------|----------------|----------------------------|--------|
| 2018 | $180,000 | - | $2,181 | $182,181 |
| 2017 | $180,000 | - | $2,700 | $182,700 |
| 2016 | $177,231 | $81,300 | $2,659 | $261,190 |

Defendant Reynolds is a citizen of Georgia.

22.     Defendant Bonnie L. Herron ("Herron") was Intelligent Systems' CFO from 1999 to June 2016, Vice President from 1990 to June 2016, Corporate Secretary from 1987 to June 2016, and Director of Planning from 1982 to 1987.  Defendant Herron is named as a defendant in a related securities class action amended complaint that alleges she violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  Defendant Herron knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the qualifications, independence, and personal

entanglements of the Company's fiduciaries; and (ii) Intelligent Systems' related-party transactions. Intelligent Systems paid defendant Herron the following compensation as an executive:

| Year | Salary | Bonus | Other Annual Compensation | Total |
|------|--------|-------|---------------------------|-------|
| 2016 | $175,000 | - | $2,625 | $177,625 |
| 2015 | $181,731 | $95,000 | $2,726 | $279,457 |
| 2014 | $172,308 | - | $2,585 | $174,893 |

Defendant Herron is a citizen of Georgia.

23.     Defendant James V. Napier ("Napier") was an Intelligent Systems director from 1982 to June 2015. Defendant Napier was a member of the Company's Audit Committee from at least April 2014 to June 2015. Defendant Napier is named as a defendant in a related securities class action amended complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder. Defendant Napier knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the qualifications, independence, and personal entanglements of the Company's fiduciaries; and (ii) Intelligent Systems' related-party transactions. Intelligent Systems paid defendant Napier the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Option Awards | Total |
|------|------------------------------|---------------|-------|
| 2015 | $58,000 | - | $58,000 |
| 2014 | $16,000 | $4,240 | $20,240 |

Defendant Napier is a citizen of Georgia.

24.     Defendant Petit was an Intelligent Systems director from 1996 to August 2019. Defendant Petit was a member of the Company's Audit Committee from at least April 2014 to August 2019. Defendant Petit is named as a defendant in a related securities class action amended complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act and

SEC Rule 10b-5 promulgated thereunder.   Defendant Petit knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the qualifications, independence, and personal entanglements of the Company's fiduciaries; and (ii) Intelligent Systems' related-party transactions.   In addition, defendant Petit negligently made misleading statements and omissions in the 2017 Proxy concerning defendant Petit's qualifications and independence and in the 2018 Proxy concerning defendant Strange's independence.   Intelligent Systems paid defendant Petit the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Option Awards | Total |
|------|------------------------------|---------------|-----------|
| 2018 | $10,000 | $19,457 | $29,457 |
| 2017 | $14,000 | $9,340 | $23,340 |
| 2016 | $10,000 | $9,760 | $19,760 |
| 2015 | $16,000 | $8,400 | $24,400 |
| 2014 | $16,000 | $4,240 | $20,240 |

Defendant Petit is a citizen of Georgia.

25.    Defendant Cherie M. Fuzzell ("Fuzzell") was an Intelligent Systems director from 2012 to September 2017.   Defendant Fuzzell was a member of the Company's Audit Committee from at least April 2014 to September 2017.   Defendant Fuzzell is named as a defendant in a related securities class action amended complaint that alleges she violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.   Defendant Fuzzell knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the qualifications, independence, and personal entanglements of the Company's fiduciaries; and (ii) Intelligent Systems' related-party transactions.   In addition, defendant Fuzzell negligently made misleading statements and omissions in the 2017 Proxy concerning defendant Petit's qualifications and independence.   Intelligent Systems paid defendant Fuzzell the following compensation as a director:

| Year | Fees Earned or Paid in Cash | Option Awards | Total |
|------|------|------|------|
| 2017 | $12,000 | $9,340 | $21,340 |
| 2016 | $16,000 | $9,760 | $25,760 |
| 2015 | $16,000 | $8,400 | $24,400 |
| 2014 | $16,000 | $4,240 | $20,240 |

Defendant Fuzzell is a citizen of Georgia.

26.     The defendants identified in ¶¶17-18, 21-22 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶17, 19-20, 23-25 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶19-20, 23-25 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶17-25 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

27.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Intelligent Systems and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Intelligent Systems in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Intelligent Systems and not in furtherance of their personal interest or benefit.

28.     To discharge their duties, the officers and directors of Intelligent Systems were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Intelligent Systems were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d)     remain informed as to how Intelligent Systems conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**The Company's Code of Conduct Imposes Additional Duties on the Individual Defendants**

29.     The Individual Defendants, like all Company employees and directors, were and are required to follow the policies and procedures set forth in Intelligent Systems' Code of Conduct.  The Code of Conduct mandates the "full, fair, accurate, timely, and understandable disclosure to shareholders of all material information regarding our business" and reinforces the Individual Defendants' obligation "to comply will all local laws and regulations at all times."

30.     The Code of Conduct contains a specific provision on conflicts of interest which required the Individual Defendants to "avoid any conflict, or the appearance of a conflict, between … personal interests and the interests of the Company."  The Code of Conduct further mandates the disclosure of any conflict "or any action or relationship that might give rise to a conflict."  In particular, the Code of Conduct states:

**Conflicts of Interest**

You must avoid any conflict, or the appearance of a conflict, between your personal interests and the interests of the Company. A conflict exists when your personal interests in any way interfere with the interests of the Company as a

whole, or when you take any action or have any interest that may make it difficult for you to perform your job objectively and effectively. For example, a conflict of interest probably exists if:

- you cause the Company to enter into business relationships with you or a member of your family;

- you use any nonpublic information about the Company, our suppliers, our customers, or our other business partners for your personal gain, or the gain of a member of your family;

- you or a family member receive a loan, or guarantee of a loan or other obligation, as a result of your position with the Company;

You must disclose any conflicts of interest, or any action or relationship that might give rise to a conflict, to Karen Reynolds, Chief Financial Officer, who is the Designated Officer at the Company's corporate office, 770-381-2900. In the event the Designated Officer is involved in the action or relationship giving rise to the conflict of interest, you should disclose the conflict to any other member of management or to a member of the board of directors.

31.     The Code of Conduct also contains a specific provision on whistleblower protections reminding the Individual Defendants that it is unlawful to retaliate against whistleblowers and proscribing them from any form of discrimination against any employee "who engages in … 'whistleblower' activities."  In particular, the Code of Conduct states:

**"Whistleblower" protections.** It is against the law to discharge, demote suspend, threaten, harass, or discriminate in any manner against an employee who provides information or otherwise assists in investigations or proceedings relating to violations of federal securities laws or other federal laws prohibiting fraud against shareholders. You must not discriminate in any way against an employee who engages in these "whistleblower" activities.

32.     The Code of Conduct required the Individual Defendants to "report any suspected violations of applicable laws, rules, regulations, or this Code" either to the Designated Officer, or "any member of senior management or the Board or Directors."  The Code of Conduct states there are "[n]o [e]xcuses" for failure to comply with it and that violations "will result in appropriate corrective action, up to and including dismissal."  Any waiver of the Code of

Conduct "may be made only by the Board of Directors or a committee of the Board."  If the waiver is for an executive officer or Board member, it "must be promptly disclosed to shareholders in accordance with SEC rules."

**Additional Duties of the Audit Committee Defendants**

33.     In addition to these duties, the Audit Committee Defendants, defendants Moise, Chandler, Napier, Petit, and Fuzzell, owed specific duties to Intelligent Systems to assist the Board in overseeing the Company's financial information and systems of internal controls. Intelligent Systems' Audit Committee Charter required these defendants to "[p]rovide an open avenue of communication between the Audit Committee, the independent accountant, management and the Board of Directors" and "[i]inquire of management and the independent accountant about the significant risks or exposures and assess the steps management has taken to minimize such risk to the Company."

34.     The Audit Committee also had specific duties to "***[c]onfirm and assure the independence of the independent accountant***."  To that end, the Audit Committee was required to, at the minimum:

> (a) receive from the independent accountant a formal written statement delineating all relationships between the independent accountant and the Company, consistent with Independence Standards Board Standard No. 1; (b) actively engage in a dialogue with the independent accountant with respect to any disclosed relationships or services that may impact the objectivity and independence of the independent accountant, and (c) take appropriate action to oversee the independence of the independent accountant.

35.     In addition, the Audit Committee Charter provides the Audit Committee is responsible for considering and reviewing the adequacy of the Company's internal controls, disclosure policies and procedures, and risk management.

36.    The Audit Committee Charter also requires the Audit Committee to review and assure the accuracy of the Company's public filings and financial statements.  In particular, the Charter states the Audit Committee is required to:

> Meet with management and the independent accountant at the completion of the annual examination to review:
>
> a.  The Company's annual financial statements and footnotes to be included in the Company's Annual Report on Form 10-K or Form 10-KSB, including their accuracy, completeness and overall quality.
> b.  The independent accountant's audit of the financial statements and their report thereon.
> c.  Any significant changes required in the independent accountant's audit plan.
> d.  Any serious difficulties or disputes between the independent accountant and management encountered during the course of the audit.
> e.  Other matters related to the conduct of the audit, which are to be communicated to the Audit Committee under generally accepted auditing standards.
>
> Review filings with the SEC and other published documents containing the Company's financial statements and consider whether the information contained in these documents is consistent with the information contained in the financial statements.

37.    Last, the Audit Committee is required to review: (i) compliance with the Company's Code of Ethics; and (ii) "legal and regulatory matters that may have a material impact on the financial statements, related Company compliance policies, and programs and reports received from regulators."

**Breaches of Duties**

38.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Intelligent Systems, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

- 16 -

39.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to disseminate improper statements.  These improper practices wasted the Company's assets and caused Intelligent Systems to incur substantial damage.

40.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Intelligent Systems, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Intelligent Systems has expended, and will continue to expend, significant sums of money.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

41.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

42.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Intelligent Systems, regarding the Individual Defendants' management of Intelligent Systems' operations; and (ii) enhance the Individual Defendants' executive and directorial positions at Intelligent Systems and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually,

took the actions set forth herein.

43.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

44.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

45.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

46.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## LEGAL AND REGULATORY FRAMEWORK

**Independence Requirements and Disclosures**

47.     As a NYSE listed company, Intelligent Systems is required to comply with the rules and standards set forth in the NYSE Listed Company Manual.  The NYSE requires a

company's board of directors to comprise a majority of independent directors.  NYSE Listed Company Manual §303A.01.  The compensation committee and audit committee must be composed entirely of independent directors.  *Id.* §303A.05(a); §303A.07(a).  A director is not independent unless the board of directors has "affirmatively determine[d]" the individual has "no material relationship with the listed company (either directly or as a partner, shareholder or officer of an organization that has a relationship with the company).  *Id.* §303A.02(a)(i).  In making independence determinations, the NYSE's commentary accompanying the section states that the board of directors should "broadly consider all relevant facts and circumstances." Moreover, "when assessing the materiality of a director's relationship with the listed company, the board should consider the issue not merely from the standpoint of the director, but also from that of persons or organizations with which the director has an affiliation."

48.     In addition, under Item 407 of Regulation S-K, 17 C.F.R. §229.407, Intelligent Systems must make certain independence disclosures in its Proxy Statements and Annual Reports on Forms 10-K.  In particular, it requires the Company disclose "[f]or each director or nominees for director … any transactions, relationships, or arrangements … that were considered by the board of directors … in determining that the director is independent."  *Id.*  The instructions to Item 407 clarify that these transactions, relationships, or arrangements "must be provided in such detail as is necessary to fully describe the nature of the transactions, relationships, or arrangements."  *Id.*

**Related-Party Transactions and Disclosures**

49.     Publicly traded companies like Intelligent Systems must also adhere to GAAP. GAAP requires companies to disclose "related party transactions" and describe the nature of the relationship involved.   Financial Accounting Standards Board's Accounting Standards

Codification Topic 850 ("ASC 850").  Related parties include those that "can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fulling pursuing its own separate interests."  ASC 850-10-20.

**THE INDIVIDUAL DEFENDANTS' OVERSIGHT FAILURES
AND ILLEGAL ACTIONS**

**Defendant Petit Serves on the Board Despite His Fraudulent Track Record**

50.      Defendant Petit is a noted fraudster unfit to serve as a fiduciary for any publicly traded company.  He inflicted corporate trauma upon several companies under his management.  His mere association with the Company presented, at a minimum, tangible risks of liability and reputational damage.  Defendant Strange even admitted during a June 5, 2019 conference call that he was aware short sellers would turn their attention to Intelligent Systems because of its relationship with defendant Petit.  Publicized governmental investigations and lawsuits were brought against at least three companies in which defendant Petit played a major role.  Importantly, defendant Strange was a director at two of these companies.  Despite knowledge of defendant Petit's wrongful conduct, the Individual Defendants allowed him to serve not only on the Board, but also on the Audit Committee.

51.      Defendant Petit's wrongful behavior was first exhibited at Healthdyne Inc. ("Healthdyne"), a heartbeat monitor company he founded under a different name in the early 1970s and took public in 1981.  Defendant Petit served as Healthdyne's Chairman and CEO until 1996.  During that time, the SEC brought an enforcement action against Healthdyne alleging it failed to report issues with monitors and misrepresented revenue and earnings projections before a 1983 secondary public offering in which company executives sold shares.  The SEC also alleged that Healthdyne failed to comply with GAAP, resulting in a $1.2 million overstatement

of revenues during the third quarter of 1983.  In June 1987, Healthdyne settled these charged by consenting to a judgment enjoining it from future violations of certain antifraud, issuer reporting, and issuer books and records provisions of the securities laws.

52.     Importantly, defendant Strange joined Healthdyne's board of directors in March 1993, making him well aware of the SEC's allegations and resulting consent order upon Healthdyne.  Defendant Strange remained a director until 1995, when Healthdyne split into three companies and spun into Healthdyne Technologies, Inc. ("Healthdyne Technologies"). Defendants Petit and Strange concurrently served on the board of directors of Healthdyne Technologies until 1998.

53.     Defendant Petit's fraudulent character and his flagrant disregard of fiduciary duties were then displayed at Matria Healthcare, Inc. ("Matria"), a seller of disease management products that also emerged from Healthdyne's split.  Defendant Petit served as Matria's Chairman from 1996 to 2008, and as its CEO from 2000 to 2008.  Defendant Strange's biography on Intelligent Systems' website reveals he was also a Matria director.  In June 2002, Matria acquired MarketRing, Inc., a software firm in which Intelligent Systems had an interest.  The Company received $48,000 worth of restricted Matria stock in exchange for their MarketRing shares.  The Individual Defendants were alerted of the wrongdoing described below given that defendant Strange was a Matria director and given that the Company held Matria stock.

54.     In October 2002, a former employee of Diabetes Self Care ("DSC"), one of Matria's wholly owned subsidiaries, filed a whistleblower complaint under the False Claims Act alleging the company was fraudulently billing Medicare.  In particular, the unsealed *qui tam* complaint alleged Matria and DSC were shipping unordered products and billing those shipments to Medicare, and that the companies' management, including defendant Petit,

condoned the scheme.  In fact, the complaint alleges defendant Petit knew that from 2000 to 2001, Matria made $15 million worth of fraudulent billings to the federal Medicare program. Then, in August 2003, a former Matria employee filed a similar whistleblower complaint.  This prompted the U.S. Department of Justice ("DOJ") to investigate Matria and intervene in the whistleblower lawsuits.   The DOJ asserted Matria effectuated numerous wrongful actions between January 1998 and December 2003, including overbilling Medicare, shipping products that had not been ordered, falsifying records, failing to credit Medicare when equipment was returned, and altering the dates of orders.  Matria paid $9 million to settle these allegations in 2006.  Defendant Petit signed the settlement agreement.

55.     Despite this severe penalty, defendant Petit continued to breach his duty of loyalty to Matria.  In 2012, the SEC filed a lawsuit against defendant Petit for providing an insider trading tips to his friend and "flying partner," Earl C. Arrowood ("Arrowood"), about the potential sale of Matria before it was publicly announced.[1]   In addition to seeking the disgorgement of Arrowood and defendant Petit's ill-gotten gains, the SEC also requested an injunctive order pursuant to section 21(d)(2) of the Exchange Act imposing an officer and director bar against defendant Petit.  The case settled on June 4, 2014, with the SEC obtaining a consent judgment against Arrowood.  Although the SEC dismissed the charges against defendant Petit, the highly publicized case and the agency's request to prohibit him from serving as an officer or director warned the Individual Defendants that defendant Petit's presence on the Board cut against Intelligent Systems' best interests.  Although the Individual Defendants were alerted

---

[1] The SEC complaint reveals Arrowood taught defendant Petit how to fly, piloted his aircraft on both personal and business trips, and in exchange, defendant Petit aided with Arrowood's investments.

his status as a fiduciary threatened the Company and its stockholders, they still refused to remove him from the Board.  Defendant Petit held his seat on the Board even as he inflicted egregious wrongdoing against yet another company.

56.     Defendant Petit's most recent victim (prior to Intelligent Systems) is MiMedx Group, Inc. ("MiMedx"), a biopharmaceutical company in which defendant Petit engaged in pervasive accounting fraud and other violations of law while serving as its CEO and Chairman from 2009 to 2018.  Defendant Petit orchestrated a notorious "channel-stuffing" scheme at MiMedx that began in 2013, and persisted even as it started to publicly unravel in 2016. Specifically, defendant Petit incentivized employees to ship unrequested products to distributors in order to fraudulently recognize unearned revenue.  In December 2016, two former MiMedx employees who had raised concerns about the legality of this practice to their superiors filed a whistleblower complaint against MiMedx and defendant Petit detailing the scheme and alleging their employment was terminated in retaliation for questioning it.

57.     Details of the wrongdoing further came to light on September 20, 2017, as Aurelius Value published a reported titled "MiMedx: Flying Too Close to the Sun."  The report corroborated the whistleblowers' channel-stuffing allegations while exposing a number of "[u]ndisclosed related party transactions and entanglements with distributors" that aided the scheme.  February 2018 brought more troubling news to public's attention: MiMedx announced it was unable to timely file its annual report due to an internal investigation into allegations of channel-stuffing; *The Wall Street Journal* revealed MiMedx violated the Physician Payments Sunshine Act;[2] and *Bloomberg* reported that the DOJ was investigating MiMedx's distribution

---

[2] Gretchen Morgenson, *MiMedx, Fast-Growing Developer of Tissue Graft Products, Didn't Report Payments to Doctors*, Wall Street Journal (Feb. 22, 2018).

practices and that interviews with MiMedx employees confirmed allegations of channel-stuffing.[3]

58.    Defendant Petit "resigned" as Chairman and CEO from MiMedx in June 2018. But on September 20, 2018, MiMedx announced its board of directors determined it had to reclassify defendant Petit's resignation as a termination "for cause" based on information gleaned from an internal investigation.

59.    MiMedx's own internal investigation found that defendant Petit engaged in a pervasive accounting fraud and went to elaborate lengths to conceal his wrongdoing.  In particular, the investigation determined that defendant Petit set an unacceptable "tone at the top," "purposefully took action to disregard revenue recognition rules under GAAP" and "made material misstatements and omissions" to MiMedx's board of directors, external auditors, and the SEC.  This included, among other things, defendant Petit signing letters misrepresenting his knowledge of fraud and submitting false documents to external auditors, misleading an audit committee investigation, and "[d]uring a deposition … falsely testif[ying] under oath."

60.    MiMedx's investigation also found that defendant Petit engaged in a pattern of retaliation against whistleblowers.  For example, the investigation uncovered evidence revealing that defendant Petit "directed an internal investigation dubbed 'Project Snow White'" to punish and discredit whistleblowers.  As part of Project Snow White, defendant Petit ordered the installment of a "secret video surveillance system" to record employees' conversations without their knowledge or consent.

---

[3] Anders Melin and Greg Farrell, *U.S. Probes MiMedx's Federal Contracts, Accounting*, Bloomberg (Feb. 26, 2018).

61.     Defendant Petit's behavior was so egregious that MiMedx stated the mere possibility of his continued service to the company made it difficult to engage an independent auditor.  In particular, MiMedx warned that if defendant Petit were reelected to its board or rehired in any management capacity, "there would be a very high risk that the [c]ompany could not engage a new auditor or any previously engaged auditor would resign."

62.     The Individual Defendants were well aware of defendant Petit's notorious wrongdoing at MiMedx.  Defendant Strange even admitted during a June 5, 2019 conference call that the allegations of defendant Petit's "various revenue manipulation practices as CEO of his former company" were "highly publicized."  Despite knowledge of defendant Petit's fraud and improper accounting, the Individual Defendants allowed defendant Petit to remain on the Audit Committee.  The Board knowingly made someone with a track record of manipulating revenue, violating GAAP, and failing to disclose related-party transactions responsible for assuring the accuracy of Intelligent Systems' financial statements and public disclosures and overseeing the Company's legal compliance.  In doing so, the Board exposed Intelligent Systems to the risk that it too would disseminate improper statements and fall out of legal compliance.  Predictably, these risks transpired.  As detailed below, Intelligent Systems issued a series of improper statements and failed to disclose related-party transactions.

63.     In addition to ignoring the warnings arising from defendant Petit's management of other publicly traded companies, the Board also repeatedly claimed his experiences there made him a "financial expert."  In particular, the Board claimed in each of the Company's Proxy Statements for the last five years that defendant Petit is a "financial expert" based on his "experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman of publicly-

traded companies." They continued to make this claim even after MiMedx announced it had retroactively altered defendant Petit's resignation to a termination for cause.

64. The Board also represented that defendant Petit was an "independent director." He was not. In reality and unbeknownst to stockholders, defendant Petit had a close personal relationship with defendant Strange. Defendant Petit remained on the Board despite the threats he posed to the Company due to his friendship with defendant Strange and because the Individual Defendants were exercising minimal to no oversight. Defendant Strange, in turn, possessed unchecked authority over the Company, as detailed below.

**The Board's Structural Failures and the Individual Defendants' Web of Entanglements**

65. Defendant Strange has been able to control the Company for most of its history due in part to his dual role as both CEO and Chairman of the Board. In addition, defendant Strange appointed Board members and CFOs who would value their loyalty to him over their loyalty Company and its stockholders. The small size of the Board further ensured defendant Strange's authority. In particular, only four directors have been on the Board since 2016. Moreover, the Board established staggered stockholder director elections to prevent large portions of their cohorts from being replaced at any one time with directors who were actually independent.

66. In each of its Proxy Statements filed from 2000 to 2019, Intelligent Systems assured investors that all directors are independent except defendant Strange. However, there are several relationships and affiliations between the Individual Defendants that contradict the Board's claims of independence. Although these connections were required disclosures under Item 407 of Regulation S-K because they weighed in on the Board's independence determinations, the Company's public filings never mentioned any of them.

67.     Defendants Petit, who served on the Board from 1996 until his resignation in September 2019, has a close relationship with defendant Strange that spans over three decades and disqualifies his independence.   In addition to concurrently serving as fiduciaries of Healthdyne and Matria, defendants Strange and Petit also partnered together on real estate deals in Florida through an entity named Atrix Realty, Inc. ("Atrix").   They concurrently served as officers and directors of Atrix from at least May 1995 to April 2014.   Further, defendants Petit and Strange concurrently serve on the Board of Trustees of the Georgia Tech Foundation, Inc. ("GTF"), and have since at least 2005.

68.     Defendant Chandler is also connected to defendants Petit and Strange.   He too concurrently serves on GTF's Board of Trustees and has since 2005.   In addition, defendants Petit, Strange, and Chandler all serve on GTF's Investments Committee and have since at least July 2011.   Defendant Chandler was also the fiduciary of a venture capital fund that invested in an entity affiliated with defendant Strange.   In particular, defendant Chandler, was a director of Georgia Research Alliance Venture Fund, LLC ("GRA Venture Fund") from at least September 2014 to at least April 2016.   In 2013, the GRA Venture Fund invested in Lumense, Inc. ("Lumense"), a failing biotechnology venture.   Defendant Strange served as the Chairman of Lumense from at least November 2013 to at least May 2016.   Lumense remained a GRA Venture Fund portfolio from 2014 to 2017.   Following defendant Fuzzell's resignation from the Board on September 23, 2017, only three directors remained: defendants Strange, Petit, and Moise.   On September 27, 2017, defendants Strange and Petit appointed their friend, defendant Chandler, to the Board.   They did so because defendant Chandler would not challenge their decisions or wrongful conduct.   They knew he would subvert his loyalty to Intelligent Systems to their friendship.

69.     Further, defendant Moise is connected to defendant Strange through AeA, a nationwide nonprofit trade association that was representative of various segments of the technology industry.  AeA lobbied at state, federal, and international levels; offered business services and networking programs; and provided access to business opportunities and capital. Defendant Moise was a member of AeA in at least January 2001, and defendant Strange was the Chair of AeA in at least February 2001.  Defendant Herron is also associated with AeA.  She was an AeA director from at least January 2001 to March 2001.  Further, defendants Moise and Herron are connected through the Technology Association of Georgia, a membership organization focused on connecting the marketplace and advancing economic development within the technology community.  Defendant Moise was a member of the Technology Association of Georgia in at least January 2001, and defendant Herron was a director from at least January 2001 to March 2005.

70.     Defendant Strange also had deep ties with the Company's former CFOs. Defendant Herron, who was CFO from 1999 to 2016, has a close business relationship with defendant Strange dating back to the 1980s, when they met at Mercer University.  Defendant Strange was a Marketing Professor at Mercer University from 1976 to 1983, while defendant Herron was an M.B.A. student there from 1980 to 1982.  In 1981, defendants Strange and Herron began creating companies together, while the two were both affiliated with Mercer University. In 1981, they cofounded Quadrum, which merged with Intelligent Systems in 1983.  In 1988, they cofounded Datavue Corporation, which also merged with Intelligent Systems in the 1980s. In 1998, defendants Strange and Herron founded QS Technologies, which subsequently became a Company subsidiary.  Defendant Strange made defendant Herron the CFO of Intelligent Systems in 1999.

71.     When defendant Herron resigned in June 2016, defendant Strange replaced her with defendant Reynolds, another former Company CFO with whom he had a business relationship.  Since the 1990s, Intelligent Systems has operated and sponsored the Gwinnett Innovation Park (formerly known as the Intelligent Systems Incubator) ("GIP").  GIP provides companies with access to office space, infrastructure, business advice and planning, and professional services.  Defendant Herron was the Executive Director of GIP from 1990 to 2010. zBoost entered GIP in 2006.  Defendant Reynolds was the CFO of zBoost from 2008 to 2015.  In 2010, GIP arranged a $1.5 million equity investment in zBoost after the company won a prestigious award.  Defendant Reynolds became CoreCard's CFO in September 2015, a position she held until her resignation from the Company in January 2019.

72.     These undisclosed relationships and affiliations between the Individual Defendants demonstrates an utter disregard of proper governance and facilitated the wrongful conduct detailed herein.  The Company's fiduciaries were too conflicted to challenge defendant Strange's decisions.  Defendant Strange—the dual CEO and Chairman with his cohorts beside him—was able to manage Intelligent Systems as he wished, even if it was against the Company's best interest.  Since defendant Strange wanted his friend defendant Petit to remain at the Company, he did.

73.     Moreover, the Board disregarded their oversight responsibilities and essentially served as dummy directors, doing little more than going through the motions during Board meetings, which were rarely held.  In 2018 for example, the Board met only four times.  The Compensation Committee, made up of the three "independent directors," defendants Petit, Moise, and Chandler, met just once.  During the meeting, these conflicted directors approved a $245,000 bonus for their friend defendant Strange.  Today, there are only three directors on the

Company's Board: defendants Strange, Moise, and Chandler.  Consequently, Intelligent Systems arguably does not have a single independent director on its Board.  And the Company's independence issues do not end here.

**The CEO's Undisclosed Personal Relationship with the Company's Auditor**

74.    The Company's previous auditor stepped down from auditing Intelligent Systems because it was the only public company it audited.  Rather than take this as an indication that Intelligent Systems should hire an auditor with public company experience, the Individual Defendants instead hired yet another auditor that had no public company clients, Nichols, Cauley & Associates, LLC ("Nichols Cauley").

75.    Intelligent Systems hired Nichols Cauley in part because defendant Strange had an undisclosed personal relationship with Nichols Cauley's audit engagement partner, Ian Waller ("Waller").  In particular, Waller and defendant Strange served as leaders of the same church and led a five-month development process together.  This relationship with the Company's "independent auditor" contravenes the SEC's requirement that auditors be "capable of exercising objective and impartial judgment on all issues."  Although the truth about Nichols Cauley's lack of independence and public company experience has publicly emerged, it amazingly remains Intelligent Systems' supposed "independent auditor."

**Defendants Conceal Related-Party Transactions**

76.    The Individual Defendants concealed a number of related-party transactions in violation of GAAP and the Company's own Code of Conduct.  For instance, they failed to disclose that the Company made a loan to one of its employees.  Although Intelligent Systems reported in March 2018 that it loaned $235,000 to a "private limited company in India in the FinTech industry," it failed to disclose that the startup was founded by Anupam Pathak—the

managing director of its India subsidiary, ISC Software Private Limited.  The Company also failed to disclose that the loan was conditioned upon the startup using CoreCard as its processor.

77.     Intelligent Systems' SEC filings also concealed the related-party nature of its significant investment into Lumense.  Intelligent Systems invested in Lumense during both the Series A and Series B financing rounds in 2011 and 2013, respectively.  The Company's SEC filings neglected to even mention the Lumense investment until 2016, when it disclosed it recorded a total $750,000 impairment charge, representing a write down of its entire investment. Intelligent Systems also failed to disclose that defendant Strange was the Chairman of Lumense. Not only that, defendant Strange invested in Lumense alongside the Company and therefore had a personal financial stake in Lumense.  But this is never mentioned in the Company's SEC filings.

## IMPROPER STATEMENTS

78.     While disregarding their oversight and governance responsibilities, the Individual Defendants further breached their fiduciary duties by making or allowing Intelligent Systems to make a series of improper statements in its public filings with the SEC.  In particular, between May 24, 2014 and May 29, 2019, these fiduciaries claimed defendant Petit qualified as both an "independent" director and as a "financial expert" when, in reality, his undisclosed ties to defendant Strange and his pervasive accounting fraud meant he was neither.  The Individual Defendants also purported to disclose every related-party transaction and relationship when they were omitting several.

79.     On May 23, 2014, Intelligent Systems filed a Current Report on Form 8-K with the SEC announcing that voting results of the May 22, 2014 Annual Meeting of Shareholders. The Form 8-K reported that the stockholders voted to elect defendants Petit and Fuzzell to serve

on the Board until the 2017 Annual Meeting. The stockholders voted based on defendants Strange's Moise's, Napier's, Petit's, and Fuzzell's representations in the Company's Proxy Statement filed with the SEC on April 4, 2014 (the "2014 Proxy"). The 2014 Proxy included a biography of defendant Petit and characterized him as a "financial expert" while concealing his pervasive accounting fraud at MiMedx and other wrongdoings at companies he was previously involved with. It further claimed defendant Petit was an "independent director" without mentioning his undisclosed relationship and transactions with defendant Strange. In particular, the 2014 Proxy stated:

> *Parker (Pete) H. Petit* has served as a director since 1996 and is nominated for re-election to the Board for a three-year term ending at the 2017 Annual Meeting of Shareholders. Mr. Petit is the Chairman, President and CEO of MiMedx Group, an integrated developer, manufacturer and marketer of bio-material based products. Mr. Petit is also the President of The Petit Group, a private investment company. Mr. Petit served as Chairman of the Board and Chief Executive Officer of Matria Healthcare, Inc., a comprehensive disease management services company from 1996 to 2008. He also served as a director of Logility, Inc. within the past five years. The Board considered Mr. Petit's extensive experience as a successful entrepreneur and as an executive and member of the board of directors of several publicly traded technology and healthcare companies, as well as his familiarity with the company since 1996 in determining that he should serve as a director of the company. The Board has determined that Mr. Petit is an ***independent director*** under the applicable rules of NYSE MKT.

> \*      \*      \*

> During 2013, the Audit Committee consisted of Ms. Fuzzell and Messrs. Petit and Napier (chair). In 2013, the Audit Committee appointed the company's independent auditor, met with the independent auditor to review its report on the 2012 audit and the 2013 quarterly reviews, and carried out a number of other responsibilities, as outlined in the Audit Committee Charter.

> All members of the Audit Committee currently meet the applicable independence and qualifications standards of the NYSE MKT. The Board has determined that ***Mr. Petit and Mr. Napier are financial experts*** as defined by the rules of the SEC, and are financially sophisticated as defined in the listing standards of NYSE MKT. The Board based this determination, in part, on Mr. Petit's experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman

of publicly-traded companies. Mr. Napier's experience includes serving on the audit committees of several large publicly traded companies as well as serving in executive positions and as the chairman of publicly traded companies.

80.     On February 18, 2015, Intelligent Systems filed its Annual Report on Form 10-K for the year ended December 31, 2014 (the "2014 Form 10-K") with the SEC, which was signed by defendants Strange, Moise, Herron, Napier, Petit, and Fuzzell.  The 2014 Form 10-K contained sections titled "Certain Relationships And Related Transactions, And Director Independence" and "Related Party Transaction," which disclosed that the lease on the Company's headquarters is held by an entity owned by defendant Strange.  However, the 2014 Form 10-K omitted defendant Strange's undisclosed relationships and related-party transactions with defendant Petit and others, including the Company's auditor.  It also concealed that Intelligent Systems was engaged in undisclosed related-party transactions.  In particular, the 2014 Form 10-K stated:

### CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by J. Leland Strange, our Chairman and Chief Executive Officer. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. We paid ISC Properties, LLC $468,000 and $467,000 in the years ending December 31, 2014 and 2013, respectively.

Please refer to the subsection entitled "Proposal 1 - The Election of Two Directors - Nominees" in the Proxy Statement referred to in Item 10 for information regarding the independence of the company's directors. This information is incorporated into this Item 13 by reference.

81.     On April 13, 2015, defendants Strange, Moise, Napier, Petit, and Fuzzell caused Intelligent Systems filed its Proxy Statement with the SEC for the Annual Meeting of Shareholders to be held on June 11, 2015 (the "2015 Proxy").  The 2015 Proxy included a biography of defendant Petit and characterized him as a "financial expert" while concealing his

pervasive accounting fraud at MiMedx and other wrongdoings at companies he was previously involved with.   It further claimed defendant Petit was an "independent director" without mentioning his undisclosed relationship and transactions with defendant Strange.   In particular, the 2015 Proxy stated:

> *Parker (Pete) H. Petit* has served as a director since 1996. Mr. Petit is the Chairman, President and CEO of MiMedx Group, an integrated developer, manufacturer and marketer of bio-material based products. Mr. Petit is also the President of The Petit Group, a private investment company. Mr. Petit served as Chairman of the Board and Chief Executive Officer of Matria Healthcare, Inc., a comprehensive disease management services company from 1996 to 2008. He also served as a director of Logility, Inc. within the past five years. The Board considered Mr. Petit's extensive experience as a successful entrepreneur and as an executive and member of the board of directors of several publicly traded technology and healthcare companies, as well as his familiarity with the company since 1996 in determining that he should serve as a director of the company. The Board has determined that Mr. Petit is an ***independent director*** under the applicable rules of NYSE MKT.

> \*     \*     \*

> During 2014, the Audit Committee consisted of Ms. Fuzzell (chair) and Messrs. Petit, Moise and Napier. In 2014, the Audit Committee appointed the company's independent auditor, met with the independent auditor to review its report on the 2013 audit and the 2014 quarterly reviews, and carried out a number of other responsibilities, as outlined in the Audit Committee Charter.

> All members of the Audit Committee currently meet the applicable independence and qualifications standards of the NYSE MKT. The Board has determined that ***Mr. Petit and Mr. Napier are financial experts*** as defined by the rules of the SEC, and are financially sophisticated as defined in the listing standards of NYSE MKT. The Board based this determination, in part, on Mr. Petit's experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman of publicly-traded companies. Mr. Napier's experience includes serving on the audit committees of several large publicly traded companies as well as serving in executive positions and as the chairman of publicly traded companies.

82.     On March 16, 2016, Intelligent Systems filed its Annual Report on Form 10-K for the year ended December 31, 2015 (the "2015 Form 10-K") with the SEC, which was signed by defendants Strange, Moise, Herron, Petit, and Fuzzell.   The 2015 Form 10-K contained sections

titled "Certain Relationships And Related Transactions, And Director Independence" and "Related Party Transaction," which disclosed that the lease on the Company's headquarters is held by an entity owned by defendant Strange.  However, the 2015 Form 10-K omitted defendant Strange's undisclosed relationships and related-party transactions with defendant Petit and others, including the Company's auditor.  It also concealed that Intelligent Systems was engaged in undisclosed related-party transactions.  In particular, the 2015 Form 10-K stated:

### CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by J. Leland Strange, our Chairman and Chief Executive Officer. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. We paid ISC Properties, LLC $275,000 and $468,000 in the years ending December 31, 2015 and 2014, respectively.  Simultaneous with the sale of our ChemFree subsidiary on March 31, 2015, we renewed our facility lease with ISC Properties, Inc. and reduced the amount of space leased.

Please refer to the subsection entitled "Proposal 1 - The Election of One Director - Nominee" in the Proxy Statement referred to in Item 10 for information regarding the independence of the company's directors. This information is incorporated into this Item 13 by reference.

83.     On April 1, 2016, defendants Strange, Moise, Petit, and Fuzzell caused Intelligent Systems filed its Proxy Statement with the SEC for the Annual Meeting of Shareholders to be held on May 26, 2016 (the "2016 Proxy").  The 2016 Proxy included a biography of defendant Petit and characterized him as a "financial expert" while concealing his pervasive accounting fraud at MiMedx and other wrongdoings at companies he was previously involved with.  It further claimed defendant Petit was an "independent director" without mentioning his undisclosed relationship and transactions with defendant Strange.  In particular, the 2016 Proxy stated:

*Parker (Pete) H. Petit* has served as a director since 1996. Mr. Petit is the Chairman, President and CEO of MiMedx Group, an integrated developer, manufacturer and marketer of bio-material based products. Mr. Petit is also the President of The Petit Group, a private investment company. Mr. Petit served as Chairman of the Board and Chief Executive Officer of Matria Healthcare, Inc., a comprehensive disease management services company from 1996 to 2008. The Board considered Mr. Petit's extensive experience as a successful entrepreneur and as an executive and member of the board of directors of several publicly traded technology and healthcare companies, as well as his familiarity with the company since 1996 in determining that he should serve as a director of the company. The Board has determined that Mr. Petit is an ***independent director*** under the applicable rules of NYSE MKT.

*      *      *

During 2015, the Audit Committee consisted of Ms. Fuzzell (chair) and Messrs. Petit and Moise. In 2015, the Audit Committee appointed the company's new independent auditor, met with the former independent auditor to review its report on the 2014 audit and the 2015 quarterly reviews, and carried out a number of other responsibilities, as outlined in the Audit Committee Charter.

All members of the Audit Committee currently meet the applicable independence and qualifications standards of the NYSE MKT. The Board has determined that ***Mr. Petit is a financial expert*** as defined by the rules of the SEC, and is financially sophisticated as defined in the listing standards of NYSE MKT. The Board based this determination, in part, on Mr. Petit's experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman of publicly-traded companies.

84.    The 2016 Proxy also disclosed "Certain Relationships and Related Transactions," including that the Company's leaseholder is an entity owned by defendant Strange.  However, the 2016 Proxy continued to omit the various undisclosed relationships and transactions of Defendant Strange and Intelligent Systems.  In particular, the 2016 Proxy stated:

The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by our Chairman and Chief Executive Officer, J. Leland Strange. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. In the years ended December 31, 2015 and 2014, we paid $275,000 and $468,000, respectively, in rent to ISC Properties, LLC, which the company believes to be market rate.

85.     On March 17, 2017, Intelligent Systems filed its Annual Report on Form 10-K for the year ended December 31, 2016 (the "2016 Form 10-K") with the SEC, which was signed by defendants Strange, Moise, Reynolds, Petit, and Fuzzell.  The 2016 Form 10-K contained sections titled "Certain Relationships And Related Transactions, And Director Independence" and "Related Party Transaction," which disclosed that the lease on the Company's headquarters is held by an entity owned by defendant Strange.  However, the 2016 Form 10-K omitted defendant Strange's undisclosed relationships and related-party transactions with defendant Petit and others, including the Company's auditor.  It also concealed that Intelligent Systems was engaged in undisclosed related-party transactions.  In particular, the 2016 Form 10-K stated:

### CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by J. Leland Strange, our Chairman and Chief Executive Officer. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. We paid ISC Properties, LLC $210,000 and $275,000 in the years ending December 31, 2016 and 2015, respectively.  Simultaneous with the sale of our ChemFree subsidiary on March 31, 2015, we renewed our facility lease with ISC Properties, Inc. and reduced the amount of space leased.

Please refer to the subsection entitled "Proposal 1 - The Election of Two Directors - Nominees" in the Proxy Statement referred to in Item 10 for information regarding the independence of the company's directors. This information is incorporated into this Item 13 by reference.

86.     On April 5, 2017, defendants Strange, Moise, Petit, and Fuzzell caused Intelligent Systems filed its 2017 Proxy with the SEC for the Annual Meeting of Shareholders to be held on May 25, 2017.  The 2017 Proxy included a biography of defendant Petit and characterized him as a "financial expert" while concealing his pervasive accounting fraud at MiMedx and other wrongdoings at companies he was previously involved with.  It further claimed defendant Petit was an "independent director" without mentioning his undisclosed relationship and transactions

with defendant Strange.  In particular, the 2017 Proxy stated:

> *Parker (Pete) H. Petit* has served as a director since 1996 and is being nominated for re-election to the Board for a three year term ending in 2020. Mr. Petit is the Chairman, President and CEO of MiMedx Group, Inc., an integrated developer, manufacturer and marketer of bio-material based products. Mr. Petit is also the President of The Petit Group, a private investment company. Mr. Petit served as Chairman of the Board and Chief Executive Officer of Matria Healthcare, Inc., a comprehensive disease management services company from 1996 to 2008. The Board considered Mr. Petit's extensive experience as a successful entrepreneur and as an executive and member of the board of directors of several publicly traded technology and healthcare companies, as well as his familiarity with the company since 1996 in determining that he should serve as a director of the company. The Board has determined that Mr. Petit is an **independent director** under the applicable rules of NYSE MKT.

> \*        \*        \*

> During 2016, the Audit Committee consisted of Ms. Fuzzell (chair) and Messrs. Petit and Moise. In 2016, the Audit Committee appointed the company's independent auditor to review its report on the 2015 audit and the 2016 quarterly reviews, and carried out a number of other responsibilities, as outlined in the Audit Committee Charter.

> All members of the Audit Committee currently meet the applicable independence and qualifications standards of the NYSE MKT. The Board has determined that **Mr. Petit is a financial expert** as defined by the rules of the SEC, and is financially sophisticated as defined in the listing standards of NYSE MKT. The Board based this determination, in part, on Mr. Petit's experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman of publicly-traded companies.

87.     The 2017 Proxy also disclosed "Certain Relationships and Related Transactions," including that the Company's leaseholder is an entity owned by defendant Strange.  However, the 2017 Proxy continued to omit the various undisclosed relationships and transactions of Defendant Strange and Intelligent Systems.  In particular, the 2017 Proxy stated:

> The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by our Chairman and Chief Executive Officer, J. Leland Strange. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. In the years ended December

31, 2016 and 2015, we paid $210,000 and $275,000, respectively, in rent to ISC Properties, LLC, which the company believes to be market rate.

88.     On March 15, 2018, Intelligent Systems filed its Annual Report on Form 10-K for the year ended December 31, 2017 (the "2017 Form 10-K") with the SEC, which was signed by defendants Strange, Moise, Chandler, Reynolds, and Petit.   The 2017 Form 10-K contained sections titled "Certain Relationships And Related Transactions, And Director Independence" and "Related Party Transaction," which disclosed that the lease on the Company's headquarters is held by an entity owned by defendant Strange.   However, the 2017 Form 10-K omitted defendant Strange's undisclosed relationships and related-party transactions with defendant Petit and others, including the Company's auditor.   It also concealed that Intelligent Systems was engaged in undisclosed related-party transactions.   In particular, the 2017 Form 10-K stated:

> **CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**
>
> The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by J. Leland Strange, our Chairman and Chief Executive Officer. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. We paid ISC Properties, LLC $210,000 in both years ending December 31, 2017 and 2016.
>
> Please refer to the subsection entitled "Proposal 1 - The Election of One Directors - Nominee" in the Proxy Statement referred to in Item 10 for information regarding the independence of the company's directors. This information is incorporated into this Item 13 by reference.

89.     On April 2, 2018, defendants Strange, Moise, Chandler, and Petit caused Intelligent Systems filed its 2018 Proxy with the SEC for the Annual Meeting of Shareholders to be held on May 24, 2018.   The 2018 Proxy included a biography of defendant Petit and characterized him as a "financial expert" while concealing his pervasive accounting fraud at MiMedx and other wrongdoings at companies he was previously involved with.   It further claimed defendant Petit was an "independent director" without mentioning his undisclosed

relationship and transactions with defendant Strange.  In particular, the 2018 Proxy stated:

> *Parker (Pete) H. Petit* has served as a director since 1996. Mr. Petit is the Chairman, President and CEO of MiMedx Group, Inc., an integrated developer, manufacturer and marketer of bio-material based products. Mr. Petit is also the President of The Petit Group, a private investment company. Mr. Petit served as Chairman of the Board and Chief Executive Officer of Matria Healthcare, Inc., a comprehensive disease management services company from 1996 to 2008. The Board considered Mr. Petit's extensive experience as a successful entrepreneur and as an executive and member of the board of directors of several publicly traded technology and healthcare companies, as well as his familiarity with the company since 1996 in determining that he should serve as a director of the company. The Board has determined that Mr. Petit is an ***independent director*** under the applicable rules of NYSE American.

> *            *            *

> During 2017, the Audit Committee consisted of Ms. Fuzzell (chair), until her resignation on September 23, 2017, when she was succeeded by Mr. Chandler (chair), and Messrs. Petit and Moise. In 2017, the Audit Committee appointed the company's independent auditor to review its report on the 2016 audit and the 2017 quarterly reviews, and carried out a number of other responsibilities, as outlined in the Audit Committee Charter.

> All members of the Audit Committee currently meet the applicable independence and qualifications standards of the NYSE American. The Board has determined that ***Mr. Petit is a financial expert*** as defined by the rules of the SEC, and is financially sophisticated as defined in the listing standards of NYSE American. The Board based this determination, in part, on Mr. Petit's experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman of publicly-traded companies.

90.    The 2018 Proxy also disclosed "Certain Relationships and Related Transactions," including that the Company's leaseholder is an entity owned by defendant Strange.  However, the 2018 Proxy continued to omit the various undisclosed relationships and transactions of Defendant Strange and Intelligent Systems.  In particular, the 2018 Proxy stated:

> The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by our Chairman and Chief Executive Officer, J. Leland Strange. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. In both years ended December

31, 2017 and 2016, we paid $210,000 in rent to ISC Properties, LLC, which the company believes to be market rate.

91.     On March 13, 2019, Intelligent Systems filed its Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 Form 10-K") with the SEC, which was signed by defendants Strange, White, Moise, Chandler, and Petit.  The 2018 Form 10-K contained sections titled "Certain Relationships And Related Transactions, And Director Independence" and "Related Party Transaction," which disclosed that the lease on the Company's headquarters is held by an entity owned by defendant Strange.  However, the 2018 Form 10-K omitted defendant Strange's undisclosed relationships and related-party transactions with defendant Petit and others, including the Company's auditor.  It also concealed that Intelligent Systems was engaged in undisclosed related-party transactions.  In particular, the 2018 Form 10-K stated:

> **CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**
>
> The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by J. Leland Strange, our Chairman and Chief Executive Officer. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. We paid ISC Properties, LLC $210,000 in both years ending December 31, 2018 and 2017.
>
> Please refer to the subsection entitled "Proposal 1 - The Election of One Directors - Nominee" in the Proxy Statement referred to in Item 10 for information regarding the independence of the company's directors. This information is incorporated into this Item 13 by reference.

92.     On April 12, 2019, defendants Strange, Moise, Chandler, and Petit caused Intelligent Systems filed its Proxy Statement with the SEC for the Annual Meeting of Shareholders to be held on May 23, 2019 (the "2019 Proxy").  The 2019 Proxy included a biography of defendant Petit and characterized him as a "financial expert" while concealing his pervasive accounting fraud at MiMedx and other wrongdoings at companies he was previously involved with.  It further claimed defendant Petit was an "independent director" without

mentioning his undisclosed relationship and transactions with defendant Strange.  In particular, the 2019 Proxy stated:

> *Parker (Pete) H. Petit* has served as a director since 1996. Mr. Petit is the President of The Petit Group, a private investment company. Mr. Petit was previously the CEO of MiMedx Group, Inc., an integrated developer, manufacturer and marketer of bio-material based products. Mr. Petit served as Chairman of the Board and Chief Executive Officer of Matria Healthcare, Inc., a comprehensive disease management services company from 1996 to 2008. The Board considered Mr. Petit's extensive experience as a successful entrepreneur and as an executive and member of the board of directors of several publicly traded technology and healthcare companies, as well as his familiarity with the company since 1996 in determining that he should serve as a director of the company. The Board has determined that Mr. Petit is an ***independent director*** under the applicable rules of NYSE American.
>
> *       *       *
>
> During 2018, the Audit Committee consisted of Mr. Chandler (chair) and Messrs. Petit and Moise. In 2018, the Audit Committee appointed the company's independent auditor to review its report on the 2017 audit and the 2018 quarterly reviews, and carried out a number of other responsibilities, as outlined in the Audit Committee Charter.
>
> All members of the Audit Committee currently meet the applicable independence and qualifications standards of the NYSE American. The Board has determined that ***Mr. Petit is a financial expert*** as defined by the rules of the SEC, and is financially sophisticated as defined in the listing standards of NYSE American. The Board based this determination, in part, on Mr. Petit's experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman of publicly-traded companies.

93.     The 2019 Proxy also disclosed "Certain Relationships and Related Transactions," including that the Company's leaseholder is an entity owned by defendant Strange.  However, the 2019 Proxy continued to omit the various undisclosed relationships and transactions of Defendant Strange and Intelligent Systems.  In particular, the 2019 Proxy stated:

> The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by our Chairman and Chief Executive Officer, J. Leland Strange. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. In both years ended December

31, 2018 and 2017, we paid $210,000 in rent to ISC Properties, LLC, which the company believes to be market rate.

## REASONS THE STATEMENTS WERE IMPROPER

94.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a)     defendant Petit engaged in pervasive accounting fraud, mismanagement, and other violations of law at companies he was involved with;

(b)     defendants Petit and Strange had a personal relationship and engaged in undisclosed related-party transactions;

(c)     defendant Strange had an undisclosed personal relationship with the Company's auditor;

(d)     the Company had undisclosed related-party transactions; and

(e)     as a result of the foregoing, Intelligent Systems' representations concerning its management, business operations, and future prospects were improper.

## THE TRUTH BEGINS TO EMERGE

95.     On May 23, 2019, MiMedx issued a press release and filed a Current Report on Form 8-K with the SEC disclosing the findings of an internal investigation while confirming that defendant Petit engaged in pervasive fraud and other wrongdoing as the company's CEO.  The Form 8-K affirmed allegations that defendant Petit orchestrated a channel-stuffing scheme through improper sales and distribution practices in violation of GAAP.  Specifically, MiMedx found:

*Non-Reliance on Financial Statements*

First, the Investigation revealed accounting irregularities regarding the recognition of revenue under generally accepted accounting principles ("**GAAP**"). The Audit Committee, with the concurrence of management, concluded that the Company's previously issued consolidated financial statements and financial information relating to each of the fiscal years ended December 31, 2012, 2013, 2014, 2015 and 2016 and each of the interim periods within such years, along with the unaudited condensed consolidated financial statements included in the Company's Quarterly Reports on Form 10-Q for the quarters ended March 31, 2017, June 30, 2017 and September 30, 2017, would need to be restated. The determination of the need to restate was based on the findings as of June 2018 presented to the Audit Committee, which were primarily focused on the accounting treatment afforded to the sales and distribution practices with respect to two distributors. The evidence demonstrated that former members of senior management employed certain implicit arrangements, which resulted in a course of dealing that superseded the explicit terms of the contracts, and that the Company improperly recognized revenue from these two distributors.

*Former Members of Management Disregarded Revenue Recognition Rules under Generally Accepted Accounting Principles*

Second, the Investigation found evidence that demonstrated, among other things, that former members of senior management, including Mr. Petit, the Company's former Chief Operating Officer, William C. Taylor, the Company's former Chief Financial Officer, Michael J. Senken, and the Company's former Controller, John Cranston, were aware of the Company's course of dealing with its largest distributor and that this course of dealing was inconsistent with the explicit terms of the contract. Former members of senior management were also aware that this course of dealing included detailed procedures, established as early as 2012, to determine when the distributor would pay for the Company's products.

96.     MiMedx also reported that its investigation found evidence demonstrating that defendant Petit "made material misstatements and omissions" to its board of directors, external auditors, and the SEC.  In particular, the Form 8-K stated:

*Material Misstatements and Omissions to Several Key Stakeholders and Regulators*

Fourth, the Investigation found that the evidence demonstrated that after questions began to be raised regarding the Company's accounting practices, Messrs. Petit, Taylor, Senken and Cranston made material misstatements and omissions about the Company's course of dealing with its largest distributor, as well as the Company's corresponding revenue recognition practices, to a number of key stakeholders and regulators, including the Division of Corporation Finance of the

U.S. Securities and Exchange Commission (the "*SEC*"), the Board, the Audit Committee and the Company's outside auditors. These included:

- After Mr. Cranston's predecessor questioned the Company's accounting for revenue from its largest distributor, Messrs. Petit, Taylor, Senken and Cranston did not disclose to the Audit Committee or the Company's outside auditors that the Company routinely issued credits to the distributor for lost, damaged or missing tissues, nor did they disclose that the distributor only paid the Company for a tissue after it had sold that tissue to its customer.

- On multiple occasions, Messrs. Petit, Senken and Cranston signed letters to the Company's outside auditors misrepresenting that the Company had no side deals or other arrangements that had not been disclosed to the outside auditors.

- In November 2016, after two former employees alleged that the Company had engaged in channel stuffing and improper revenue recognition practices, Messrs. Petit and Senken signed a letter to the Company's outside auditors misrepresenting that they had no knowledge of any allegations of fraud affecting the Company made by current or former employees.

- In early 2017, after the Audit Committee had retained counsel to investigate the allegations made by these former employees, Mr. Petit forwarded to the Board a set of written responses in which counsel for the Company's largest distributor explicitly stated that it only paid the Company for tissues after receiving payment from the distributor's customer. Mr. Petit misled the Board about the accuracy of the information provided by the distributor's counsel.

- Also in early 2017, the Company retained an outside expert to opine on the appropriateness of the Company's recognition of revenue from sales to its largest distributor. Messrs. Petit, Senken and Cranston made misrepresentations to the expert concerning the actual course of dealing between the Company and its largest distributor.

- In early 2017, in letters signed by Mr. Senken, the Company responded to comment letters received from the SEC's Division of Corporation Finance by misrepresenting that the Company's largest distributor was obligated to pay the Company, regardless of whether the distributor resold the product. As noted above, the Company routinely issued credits to the distributor for lost, damaged and missing tissues and received payments from the distributor based on the tissues purchased by the distributor's customer.

- In early 2018, the Company's former senior management prepared a misleading memorandum to the Company's outside auditors that misrepresented key facts regarding the Company's historical relationship with its largest distributor, which were relevant to determining the appropriate revenue recognition under GAAP.

- During a deposition, Mr. Petit falsely testified under oath that it was not true that the Company's largest distributor only paid the Company after the distributor had received a purchase order from its customer.

97.     In addition, MiMedx's internal investigation both confirmed allegations that defendant Petit retaliated against whistleblowers and revealed that he directed the installment of a "secret video surveillance system" to record employees' conversations without their knowledge or consent.  Specifically, the Form 8-K reported:

*Actions Taken Against Whistleblowers*

Further, the Investigation determined that the evidence demonstrated that Messrs. Petit and Taylor engaged in a pattern of taking action against employees who raised concerns about the Company's practices, without conducting a thorough investigation of those concerns. Instead, Messrs. Petit and Taylor focused on disputing the employees' allegations and on seeking to discredit or find wrongdoing by the persons raising the concerns that would justify re-assignment, discipline or termination. For example, after certain employees made allegations of improper accounting practices in late 2016, Mr. Petit directed and oversaw an internal investigation dubbed "Project Snow White" that focused on potential wrongdoing by these employees, rather than the merits of their allegations. As part of Project Snow White, the secret video surveillance system referenced above was installed at Mr. Petit's direction to record interviews that he, Mr. Taylor and other former members of management conducted of certain employees and those employee's discussions amongst themselves without those employees' knowledge or consent. The evidence showed that Mr. Petit directed that certain employees, whom he and other former members of senior management perceived to hold loyalty to an employee who had raised concerns about the Company's practices, be terminated.

98.     The following day, on May 24, 2019, the short seller Aurelius Value published a detailed report criticizing defendant Petit's continued service on the Company's Board and exposing numerous undisclosed personal entanglements.  The report, titled "INS: A Wolf in Pete's Clothing," explained that the Individual Defendants were "[f]arcically" characterizing

defendant Petit as the "financial expert" of the Audit Committee "even though he orchestrated a giant fraud at MiMedx that has thus far cost investors over $1.5 Billion in losses."  In particular, the report revealed:

> INS features a problematic cast of cronies, including the disgraced former CEO of MiMedx, Parker "Pete" Petit, *whom INS made the "financial expert" of its Audit Committee*, even though he orchestrated a giant fraud at MiMedx that has thus far cost investors over $1.5 Billion in losses.
>
> *            *            *
>
> **INS' Problematic Cast of Cronies**
>
> Farcically, INS has declared Parker Petit, the "financial expert" of its Audit Committee. INS' SEC Filings claim Petit is qualified for this role based on his experience "*in overseeing the preparation of financial statements*" at public companies, which INS reiterated even after Petit was terminated "for cause" by MiMedx in 2018.

99.    The report further discusses the "damning results of [MiMedx's] internal investigation which detailed the elaborate lengths that [defendant] Petit and his confederates went to hide the pervasive malfeasance at MiMedx."  Among other things, the investigation found that defendant Petit "purposely took action to disregard revenue recognition rules under GAAP," made material misstatements and omissions to MiMedx's Board, external auditors, and the SEC, and directed a secret surveillance system used to retaliate against whistleblowers. MiMedx also warned that continued associated with defendant Petit would present "a very high risk that the Company could not engage a new auditor or any previously engaged auditor would resign."

100.    In an effort to explain defendant Petit's continued service on the Board despite their knowledge of his egregious behavior and the risks he poses to the Company, the report uncovered secret ties between defendants Petit and Strange.  In particular, the report reveals that defendants Strange and Petit partnered together on real estate deals in Naples, Florida.  The

relationship is evidenced by a 2014 corporate filing listing defendants Strange and Petit as co-officers of a Florida entity, Atrix.  In addition, the report found that defendant Strange was a director at Healthdyne, the entity mentioned above that was founded by defendant Petit and sued by the SEC.  Defendants Strange and Petit are also listed as Trustees Emeritus of GTF, along with defendant Chandler.

101.   The report further exposed defendant Strange's undisclosed connection to the Company's auditor, Nichols Cauley.  Specifically, it revealed defendant Strange had a personal relationship to Nichols Cauley's engagement partner, Waller.  The two served as leaders of the same church, according to a book published by the church pastor in 2017.  The report points out that this relationship casts doubt on Waller's ability to exercise objective and independent judgment in auditing the financial statements of the Company given that its CEO is a fellow church leader.

102.   On the news of the Aurelius Value report, Intelligent Systems' stock fell 18%, or $7.17 per share, on May 28, 2019, to close at $31.94 per share compared to closing at $39.11 per share on May 23, 2019, erasing over $63 million in market capitalization.

103.   Despite the Aurelius Value report's revelations and resulting downfall to the Company, the Individual Defendants took no action against defendant Petit and instead continued to allow him to serve on the Board.

104.   Further damaging news came to light on May 30, 2019, as Grizzly Research issued a report titled "Intelligent Systems Corp: Material Undisclosed Related Party Transactions Cast Doubt on the Integrity of Financial Statements."  The report focuses on the Company's transactions with Indian companies while setting forth evidence demonstrating that the Company either engaged in round-tripping or siphoned off money to related parties.

105.     As an example, the report highlights the Company's undisclosed relationships and transactions with Flexopt Technology Private Limited ("Flexopt").  Grizzly Research begins by pointing out that the 2017 Form 10-K reported that the Company loaned $235,000 to an unidentified "private limited company in India in the FinTech industry" and subsequently signed a processing agreement with that startup for CoreCard.  It then determined the startup was Flexopt, a company founded by Anupam Pathak ("Pathak").  Pathak is the managing director of Intelligent System's India subsidiary, ISC Software Private Limited ("ISC Software").  Flexopt's financial statements filed with the Indian Ministry of Corporate Affairs show the $235,000 payment.  The filings also show that Flexopt was initially registered just eight months before the investment.  The Company thus funded Flexopt, an employee's startup, through a $235,000 loan.  Then, with $0 in revenue, Flexopt used the loan to pay for CoreCard's services—round-tripping the $235,000 right back to the Company.

106.     The report also provides further evidence of undisclosed, dubious related-party transactions.  Neeti Pathak is listed as a director of ISC Software along with Pathak and is also a director at New Vision Softcom and Consultancy Private Limited ("New Vision").  Flexopt lists New Vision as a major accounts payable vendor for Flexopt.  With zero third-party revenues to fund its expenses, Flexopt would have had to use the loan from Intelligent Systems to pay New Vision, another company founded by an Intelligent Systems employee.

107.     Following the Grizzly Research report's publication, the Company's stock plunged more than 24%, or $8.21 per share, on June 3, 2019, to close at $25.60 per share compared to closing at $33.81 per share on May 29, 2019, erasing over $72 million in market capitalization.

108.     On June 3, 2019, the Company issued a press release titled "Intelligent Systems Responds to Recent 'Short and Distort' Reports and Schedules Upcoming Conference Call."  In

the press release, Intelligent Systems conceded it was aware that Flexopt was owned by "an employee" and revealed the loan was specifically conditioned on Flexopt's use of CoreCard.  The Company thus admitted the loan was a related-party transaction because, through the CoreCard condition, it was "influenc[ing] the management or operating policies" of Flexopt.  In particular, the press release stated:

> [W]hen an employee informed Intelligent Systems that he was working on his own time with a group that wanted to set up a company to enter the large India loan market, Intelligent Systems asked to be a participant in the company and offered to invest if the new company would use CoreCard as its processor.

109.    On June 5, 2019, Intelligent Systems hosted a conference call to respond to these reports.  During the call, defendant Strange admitted that "[s]ometimes, the short players actually discover and root out dodgy or dishonest accounting or managements."  Defendant Strange further acknowledged he was aware short sellers would turn their attention to Intelligent Systems due to its relationship with defendant Petit.  Specifically, defendant Strange stated:

> *I … considered opening with a discussion of how [Aurelius Value and Grizzly Research] got to Intelligent Systems in the first place. The answer to that question is pretty obvious, one of our directors with an 18-year tenure on the board has been accused of various revenue manipulation practices as CEO of his former company.* The company was the object of a highly publicized short attack. He denies the accusation. The company's investigation claims it true along with other charges. The short players following that company found he's a director of Intelligent Systems and determined to target our company based on his association. They've come up with some innocuous claims about us to make it appear we were up to some worrying practices. His being on or off the Board does not change the accusations and innuendo. If he stays on the Board for now, they'll say we have a problem by association. Leaving the Board at this point in time, they will say that we're trying to sweep the problem under the table and make it go away by him leaving.

110.    During the call, defendant Strange also admitted to his personal relationship with Waller, the engagement partner of the Company's auditor.  Defendant Strange further admitted he was the one that effectively hired Nichols Cauley, telling defendant Herron to interview the

auditor after finding out Waller's position through their ongoing church interactions. Specifically, defendant Strange stated:

> Our previous auditor had one public company client and that was Intelligent Systems. And they notified us that they were going to get out of the public accounting, public company stock accounting business and told us we had to find another auditor. There's no issues (inaudible) about anything. In fact, I know the partner there very well, and it was just a, they made a company decision to get out of auditing public companies. It's very expensive to audit a public company as an auditor.
>
> So our CFO Bonnie Herron obviously decided she needed to start interviewing people for auditors. And, *I had met this gentleman at church.* Frankly, I didn't even know what he did at the time, I served with an audit committee, later understand he was in the accounting business and *I suggested to her that she might want to see what they do and if they do it. So, Bonnie handled the whole process. She interviewed Nichols Cauley*, she interviewed two others, and then the audit committee got involved and they chose to do Nichols Cauley. So that's how it happened, pure and simple. Again, no close relationships. *We go to the same church, that's for sure. And we see each other at church*, but has no other bearing on the choice.

111.   On August 5, 2019, Intelligent Systems filed a Current Report on Form 8-K with the SEC announcing defendant Petit's resignation from the Board and attaching his brief resignation letter addressed to defendant Strange and dated August 1, 2019.  The Form 8-K specified his resignation "was not as a result of any disagreement with the Company or any of its subsidiaries on any matters related to their operation, policies or practices."  Similarly, defendant Petit attributed his departure to his advancing age in his resignation letter, stating, "[a]lthough the [C]ompany does not have a required retirement age, I believe 80 years of age is certainly timely in my case."

112.   On November 26, 2019, the U.S. Attorney for the Southern District of New York announced the unsealing of an Indictment in Manhattan federal court charging defendant Petit with "securities fraud offenses for engaging in a scheme to fraudulently inflate MiMedx's revenues."

113.   On the same day, the SEC unveiled its own charges against defendant Petit, MiMedx, and two of its other executives for defrauding investors by misstating MiMedx's revenues and attempting to cover up his misconduct.   In its press release, the SEC also announced that MiMedx paid $1.5 million to settle the claims.

## CERTAIN DIRECTOR DEFENDANTS NEGLIGENTLY MADE MISLEADING STATEMENTS IN THE COMPANY'S PROXY STATEMENTS

114.   Plaintiff's allegations with respect to the misleading statements in both the 2017 Proxy and 2018 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.   Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

**The 2017 Proxy Statement**

115.   On April 5, 2017, Intelligent Systems filed its 2017 Proxy for the 2017 Annual Meeting of Shareholders.   The Company held the meeting on May 25, 2017.   In the 2017 Proxy, defendants Strange, Moise, Petit, and Fuzzell solicited stockholder votes to, among other things, reelect defendants Petit and Fuzzell to the Board until the 2020 Annual Meeting of Shareholders. Defendants Strange, Moise, Petit, and Fuzzell negligently issued misleading statements with respect to the solicited vote to reelect defendant Petit to the Board.

116.   In support of the bid to reelect defendant Petit to the Board, defendants Strange, Moise, Petit, and Fuzzell touted defendant Petit's "extensive experience as a successful entrepreneur and as an executive and member of the board of directors of several publicly traded technology and healthcare companies."   As examples of this "extensive experience," these defendants highlighted defendant Petit's then-current positions at MiMedx and previous positions

at Matria.  Defendants Strange, Moise, Petit, and Fuzzell also stated that there have been no judgments, injunctions, or criminal proceedings during the past ten years that would be material to the evaluation of defendant Petit's ability and integrity as a director.  They also represented to stockholders that defendant Petit is an "independent director."  In particular, the 2017 Proxy stated:

> *Parker (Pete) H. Petit* has served as a director since 1996 and is being nominated for re-election to the Board for a three year term ending in 2020. ***Mr. Petit is the Chairman, President and CEO of MiMedx Group, Inc.***, an integrated developer, manufacturer and marketer of bio-material based products. Mr. Petit is also the President of The Petit Group, a private investment company. ***Mr. Petit served as Chairman of the Board and Chief Executive Officer of Matria Healthcare, Inc.***, a comprehensive disease management services company from 1996 to 2008. The Board considered ***Mr. Petit's extensive experience as a successful entrepreneur and as an executive and member of the board of directors of several publicly traded technology and healthcare companies***, as well as his familiarity with the company since 1996 in determining that he should serve as a director of the company. The Board has determined that Mr. Petit is an ***independent director*** under the applicable rules of NYSE MKT.
>
> \*       \*       \*
>
> ***There have been no events under any bankruptcy act, no criminal proceedings and no judgments or injunctions material to an evaluation of the ability and integrity of any director, executive officer or control person of the company during the past ten years***.

117.    The 2017 Proxy misleadingly characterized defendant Petit as an "independent director" when, in reality, his undisclosed financial ties and personal connections with defendant Strange disqualified his independence.  This lack of independence diminished the already limited oversight of Intelligent Systems' four-person Board.  Because defendants Petit and Strange both lacked independence, the Company was violating the NYSE's requirement that a majority of independent directors comprise the Board.   Moreover, defendants Strange, Moise, Petit, and Fuzzell failed to comply with the disclosure requirements of Item 407 of Regulation S-K.  In particular, they failed to disclose defendants Petit's transactions and relationships with defendant

Strange even though these ties were important in determining defendant Petit's independence.

118.    In addition, the 2017 Proxy falsely represented that defendant Petit was qualified to serve on the Company's Board, a determination defendants Strange, Moise, Petit, and Fuzzell supposedly made based upon defendant Petit's experience at publicly traded companies, including MiMedx and Matria.  These statements left stockholders with the impression that defendant Petit successfully managed these companies while satisfying his fiduciary obligations to them, and that he would continue to do the same at Intelligent Systems.  In reality, defendant Petit had disregarded his fiduciary obligations to these companies, engaged in fraud and other wrongdoing while there, and caused severe corporate trauma.  At Matria, defendant Petit encouraged a years-long scheme to falsify records and overbill Medicare.  He retaliated against whistleblowers and forced Matria to pay $9 million to settle resulting claims brought by U.S. prosecutors.  Defendant Petit was orchestrating a similar scheme at MiMedx.  At the time the 2017 Proxy was filed, two former MiMedx employees had already filed whistleblower complaints detailing the channel-stuffing scheme and alleging their employment was terminated in retaliation for raising concerns about it.  The 2017 Proxy failed to disclose any of this information.  As a result, the 2017 Proxy represented that defendant Petit was qualified to serve as a director when in reality his mere presence on the Board posed significant liability and reputational risks to the Company.

119.    The 2017 Proxy's assurance to stockholders that defendant Petit's ability and integrity as a director had not been undermined by any legal events within the past ten years was also misleading.  In reality, a number of legal proceedings came to light between 2007 and 2017 that demonstrated defendant Petit lacked the ethics and competence required of a director.  For example, in 2012, the SEC brought an insider trading lawsuit against defendant Petit seeking an

order prohibiting him from serving as an officer and director.  In December 2016, just a few months prior to the 2017 Proxy's issuance, the MiMedx whistleblowers filed their lawsuit against defendant Petit detailing his fraudulent scheme.  The 2017 Proxy, however, failed to disclose these lawsuits and allowed stockholders to believe defendant Petit's character remained intact and that he was able to serve as a fiduciary.

120.    In further support of their bid to reelect defendant Petit to the Board, defendants Strange, Moise, Petit, and Fuzzell also emphasized defendant Petit's position on the Audit Committee and status as a "financial expert."  This determination, they assured, was based upon defendant Petit's "experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman of publicly-traded companies."  Specifically, the 2017 Proxy stated:

> The company has limited, if any, exposure related to financial instruments, environmental issues, off balance sheet entities and such external risks. The Audit Committee, which consists of the independent directors, provides risk oversight as part of the company's internal controls process and regularly reviews reports from management and external auditors on risk analysis and tests of the design and effectiveness of the company's internal controls.

> *          *          *

> The Audit Committee of the Board met four times during 2016. During 2016, the Audit Committee consisted of Ms. Fuzzell (chair) and Messrs. Petit and Moise. In 2016, the Audit Committee appointed the company's independent auditor to review its report on the 2015 audit and the 2016 quarterly reviews, and carried out a number of other responsibilities, as outlined in the Audit Committee Charter.

> All members of the Audit Committee currently meet the applicable independence and qualifications standards of the NYSE MKT. ***The Board has determined that Mr. Petit is a financial expert*** as defined by the rules of the SEC, and is financially sophisticated as defined in the listing standards of NYSE MKT. ***The Board based this determination, in part, on Mr. Petit's experience in actively supervising senior financial and accounting personnel and in overseeing the preparation of financial statements as the chief executive officer and chairman of publicly-traded companies***.

121.     The representation that defendant Petit was the Audit Committee's "financial expert" due to his financial and accounting oversight experience as the CEO and Chairman of several publicly traded companies was misleading to stockholders. These statements conveyed that defendant Petit honored his duties to oversee the financial statements and accounting of those companies, and that he could be trusted to do the same at Intelligent Systems. But the 2017 Proxy omitted information that turns defendant Petit's designation as a "financial expert" on its head. In particular, the 2017 Proxy failed to disclose that defendant Petit was engaging at pervasive accounting fraud at MiMedx while artificially inflating its revenue in violation of GAAP. It failed to disclose the similar scheme at Matria, as well as the violations of securities laws at Healthdyne. In addition to contradicting his status as a financial expert, this information would have warned stockholders that defendant Petit's position on the Audit Committee presented a serious risk that Intelligent Systems would also issue improper statements and violate applicable accounting rules.

122.     In addition, by claiming that defendant Petit was an independent member of the Audit Committee, the 2017 Proxy misleadingly represented the Company's compliance with the NYSE requirement that all member of the Audit Committee be independent directors. In reality, defendant Petit was not independent due to his undisclosed ties with defendant Strange and therefore the Company was failing to comply with the NYSE's Audit Committee requirements.

123.     Intelligent Systems' stockholders would want to know the omitted information detailed above in deciding whether to reelect defendant Petit to the Board. They would want to know that defendant Petit had engaged and was continuing to engage in accounting fraud, that the SEC attempted to prohibit him from serving as a director and officer, that he had a pattern of misstating financial information and violating accounting rules, and that he lacked independence

due to his cozy relationship with the CEO.  These stockholders would consider that defendant

Petit's lack of independence would cause Intelligent Systems to violate the NYSE's requirements

concerning director independence.  In addition, these stockholders would also want to know that

defendant Petit faced a damaging whistleblower lawsuit detailing an ongoing channel-stuffing

scheme at the company he was the CEO of.  In short, Intelligent Systems' stockholders would

consider defendant Petit's qualifications (or lack thereof) and the threats he posed to their

investment in the Company in voting on his reelection to the Board for the next three years.

124.    Defendants Strange, Moise, Petit, and Fuzzell, in the exercise of reasonable care,

should have known that the 2017 Proxy misstated and omitted material facts concerning

defendant Petit's qualifications and background.  These defendants admitted in the 2017 Proxy

that they considered defendant Petit's experiences at several publicly traded companies in

determining whether he should serve on the Board and also in determining that he was a

"financial expert."  A careful review of these experiences would have revealed the opposite.

Defendant Petit was aware of his own implications in wrongdoing.  Defendants Petit and Strange

knew of their own connections to one another.  Similarly, defendant Strange should have known

that defendant Petit was implicated in fraud and other wrongdoing due to their close relationship

and also due to his positions at both Healthdyne and Matria.  Nonetheless, defendants Strange,

Moise, Petit, and Fuzzell failed in their duties to ensure the 2017 Proxy fairly disclosed adequate

information in order for stockholders to make an informed choice concerning defendant Petit's

reelection.

125.    As a result of the misleading statements and omissions in the 2017 Proxy,

Intelligent Systems' stockholders voted via an uninformed stockholder vote to reelect defendant

Petit to the Company's Board.  The 2017 Proxy thus harmed the Company by interfering with the

proper governance on its behalf that follows the free and informed exercise of stockholders' right to vote for directors.

126.    In addition, had stockholders known the truth about defendant Petit, they would not have reelected him to the Board.  Thus, the 2017 Proxy also damaged Intelligent Systems by reelecting defendant Petit to the Board, thereby causing the short sellers to turn their attention to the Company and to issue the truth-revealing reports that devastated its reputation and crushed its stock price.  In addition, by reelecting defendant Petit to the Board, he remained on the Audit Committee as a "financial expert" which, in turn, facilitated the improper statements detailed herein that the Company now faces liability for.

**The 2018 Proxy Statement**

127.    On April 2, 2018, Intelligent Systems filed its 2018 Proxy for the 2018 Annual Meeting of Shareholders.  The Company held the meeting on May 24, 2018.  In the 2018 Proxy, defendants Strange, Moise, Chandler, and Petit solicited stockholder votes to, among other things, reelect defendant Strange to serve on the Board until the 2021 Annual Meeting of Shareholders.  Defendants Strange, Moise, Chandler, and Petit negligently issued misleading statements with respect to the solicited vote to reelect defendant Strange to the Board.

128.    In support of the bid to reelect defendant Strange to the Board, the 2018 Proxy represented that although defendant Strange was not independent, the remaining three members of the Board were.  In addition, the 2018 Proxy stated that Nichols Cauley was the Company's "independent registered public accounting firm."  The only disclosure included within "certain relationships and related transactions" in the 2018 Proxy was the Company's lease agreement with an entity owned by defendant Strange.  In particular, the 2018 Proxy stated:

> The Board has determined that Mr. Chandler qualifies as an independent director under the applicable rules of the NYSE American.

*     *     *

The Board has determined that Mr. Moise qualifies as an independent director under the applicable rules of the NYSE American.

*Parker (Pete) H. Petit* has served as a director since 1996. Mr. Petit is the Chairman, President and CEO of MiMedx Group, Inc., an integrated developer, manufacturer and marketer of bio-material based products. Mr. Petit is also the President of The Petit Group, a private investment company. Mr. Petit served as Chairman of the Board and Chief Executive Officer of Matria Healthcare, Inc., a comprehensive disease management services company from 1996 to 2008. The Board considered Mr. Petit's extensive experience as a successful entrepreneur and as an executive and member of the board of directors of several publicly traded technology and healthcare companies, as well as his familiarity with the company since 1996 in determining that he should serve as a director of the company. **The Board has determined that Mr. Petit is an independent director under the applicable rules of NYSE American**.

*J. Leland Strange* has served as our President since 1983 and our Chief Executive Officer and Chairman of the Board since 1985. He is being nominated for re-election to the Board for a three year term ending in 2021. The Board considered Mr. Strange's many years of experience as the company's CEO, his familiarity with the industries and customers which our operating companies serve, and his past experience on several boards of directors and audit and compensation committees of other publicly traded companies in determining that he should serve as a director of the company.

*     *     *

There have been no events under any bankruptcy act, no criminal proceedings and no judgments or injunctions material to an evaluation of the ability and integrity of any director, executive officer or control person of the company during the past ten years.

*     *     *

**Three of the directors and all of the members of the Audit Committee are independent, as such term is defined in the listing standards of the NYSE American and the rules of the SEC**. The Audit Committee meets the composition requirements of NYSE American's listing standards for Small Business Issuers (as defined by the rules of NYSE American).

**Board Leadership Structure and Role in Risk Oversight**

The Chief Executive Officer serves as Chairman of the Board of Directors of the company. Given the small size and limited geographic and industry scope of the company's operations, the company believes that the leadership structure of the Board, consisting of four directors of which three are independent, is appropriate. There is no lead independent director because there has been no need for such a role based on the continuity resulting from the tenure of the directors and the small size of the Board. Given the character, size and limited scope of the company's operations and the stability and long tenure of its workforce and management team, there is limited exposure to external risks other than general business, product and market risks. The company has limited, if any, exposure related to financial instruments, environmental issues, off balance sheet entities and such external risks. The Audit Committee, which consists of the independent directors, provides risk oversight as part of the company's internal controls process and regularly reviews reports from management and external auditors on risk analysis and tests of the design and effectiveness of the company's internal controls. The Board considered and has determined that risks arising from its compensation policies and practices are not reasonably likely to have a material adverse effect on the company. This determination was based on the limited nature of the company's compensation program.

\*     \*     \*

The Board has a *Compensation Committee consisting of three independent directors*, Messrs. Chandler, Moise (chair) and Petit.

\*     \*     \*

### INDEPENDENT REGISTERED PUBLIC ACCOUNTANTS

Nichols, Cauley & Associates, LLC ("Nichols Cauley") acted as our independent registered public accounting firm for the fiscal years ended December 31, 2017 and 2016.

\*     \*     \*

### CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

The lease on our headquarters and primary facility at 4355 Shackleford Road, Norcross, Georgia is held by ISC Properties, LLC, an entity controlled by our Chairman and Chief Executive Officer, J. Leland Strange. Mr. Strange holds a 100% ownership interest in ISC Properties, LLC. In both years ended December 31, 2017 and 2016, we paid $210,000 in rent to ISC Properties, LLC, which the company believes to be market rate.

129.    The 2018 Proxy thus assured stockholders of the adequacy of the Board's oversight while claiming that a majority of independent directors comprised the Board and that the Audit Committee and Compensation Committee were comprised entirely of independent directors.  The 2018 Proxy, however, failed to disclose defendant Petit's financial ties and close personal relationship with defendant Strange.  The 2018 Proxy also misrepresented defendant Chandler's independence while failing to disclose his ties with defendants Strange and Petit. Their close personal and business relationship disqualified defendants Petit and Chandler's independence while further diminishing the already limited oversight of Intelligent Systems' four-person Board.  Their lack of independence meant that the Company was violating the NYSE's requirements that a majority of independent directors comprise the Board, and that the Audit Committee and Compensation Committee comprise entirely of independent directors. Moreover, defendants Strange, Moise, Petit, and Chandler failed to comply with the disclosure requirements of Item 407 of Regulation S-K.  In particular, they failed to disclose information that weighed upon the Board's independence determinations, including: (i) defendant Petit's transactions and relationships with defendant Strange; (ii) defendant Chandler's affiliations with defendants Strange and Petit; (iii) and defendant Moise's connections to defendant Strange.

130.    The 2018 Proxy also continued to omit that defendant Petit, with whom defendant Strange had a close personal and business relationship, had engaged and was continuing to engage in pervasive accounting fraud.

131.    The 2018 Proxy also assured investors that the Company's auditor, Nichols Cauley, was independent.  However, the 2018 Proxy failed to disclose defendant Strange's personal relationship with Waller, the audit engagement partner of Nichols Cauley.  Defendant Strange's relationship with Waller cast the independence of Nichols Cauley into doubt.  As such,

Item 407 of Regulation S-K required disclosure of this relationship.

132.   Intelligent Systems' stockholders would want to know the omitted information detailed above in deciding whether to reelect defendant Strange to the Board.  They would want to know that defendants Petit and Chandler, and arguably defendant Moise, lacked independence because the entire composition of the Board is important in stockholder voting decisions.  They would want to know that defendants Petit and Strange had a close personal and business relationship because it limited the oversight of the Board.  Because of their relationship, defendant Strange could not act independently of and impartially towards defendant Petit, who, unbeknownst to stockholders, was a fraudster that threated Intelligent Systems' reputation and posed liability risks.  Stockholders would also want to know about defendant Strange's relationship with the Company's supposedly "independent" auditor in deciding whether to reelect defendant Strange to the Board.  Defendant Strange's relationship with Nichols Cauley undermined the Board's oversight of the Company's auditor as well as its financial statements and public disclosures.

133.   As a result of the misleading statements and omissions in the 2018 Proxy, Intelligent Systems' stockholders voted via an uninformed stockholder vote to reelect defendant Strange to the Company's Board.  The 2018 Proxy thus harmed the Company by interfering with the proper governance on its behalf that follows the free and informed exercise of stockholders' right to vote for directors.

## DAMAGES TO INTELLIGENT SYSTEMS

134.   As a result of the Individual Defendants' improprieties, Intelligent Systems disseminated improper, public statements concerning: (i) the qualifications, independence, and personal entanglements of the Company's fiduciaries; and (ii) Intelligent Systems' related-party

transactions.   These improper statements have devastated Intelligent Systems' credibility as reflected by the Company's almost $203 million, or 47%, market capitalization loss from its May 2019 high to its June 2019 low.

135.   Intelligent Systems' performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Intelligent Systems' current and potential customers consider a company's management and ability to curb known and potential abuses.  Businesses are less likely to award contracts to companies that knowingly permit or encourage unscrupulous behavior, and investors are less likely to invest in companies that fail to timely disclose material information.  Intelligent Systems' ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

136.   Further, as a direct and proximate result of the Individual Defendants' actions, Intelligent Systems has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)   costs incurred from defending and paying any settlement or adverse judgment in the Securities Class Action;

(b)   costs incurred from issuing the materially misleading Proxy Statements;

(c)   costs wasted un unqualified auditors;

(d)   costs incurred from investigating wrongdoing; and

(e)   costs incurred from compensation and benefits paid to the defendants who have breached their duties to Intelligent Systems.

## DERIVATIVE AND DEMAND-MADE ALLEGATIONS

137.    Plaintiff brings this action derivatively in the right and for the benefit of Intelligent Systems to redress injuries suffered, and to be suffered, by Intelligent Systems as a direct result of violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Intelligent Systems is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

138.    Plaintiff will adequately and fairly represent the interests of Intelligent Systems in enforcing and prosecuting its rights.

139.    Plaintiff was a stockholder of Intelligent Systems at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Intelligent Systems stockholder.

140.    On July 23, 2019, plaintiff sent a litigation demand letter to the Board in accordance with Georgia law (the "Demand").[4]  In the Demand, plaintiff explained that the Individual Defendants breached their fiduciary duties to the Company for the reasons detailed herein.  Plaintiff demanded the Board to investigate and remedy the wrongdoing detailed in the Demand, including commencing legal proceedings against those responsible.

141.    In response to the Demand, plaintiff's counsel received a letter dated July 31, 2019, from David Kistenbroker ("Kistenbroker") of the law firm Dechert LLP.[5]  Importantly, Kistenbroker is also representing Intelligent Systems and each of the Individual Defendants in

_____

[4] A true and correct copy of the Demand is attached hereto as Exhibit A.

[5] A true and correct copy of the letter dated July 31, 2019, is attached hereto as Exhibit B.

the Securities Class Action.  In the letter, Kistenbroker asked for documents demonstrating plaintiff continuously owned Company stock during the time of the wrongdoing detailed in the Demand.  Kistenbroker represented this proof was necessary "[t]o facilitate the Board's consideration of [the] demand."  He also asked for the "amount(s) and date(s) of [plaintiff's] holdings in the Company's stock."  Kistenbroker made these requests even though Georgia law does not make proof of continuous stock ownership or the amount of stock holdings a prerequisite to a litigation demand.  Georgia law only specifies that a written demand must be made before commencing a derivative action.  O.C.G.A. §14-2-742.  Although the Official Comment to section 14-2-742 of the Official Code of Georgia Annotated states a demand "should" "set forth the facts concerning share ownership," it does not require proof of ownership, let alone of continuous ownership.

142.    On September 3, 2019, plaintiff's counsel sent a letter to Kistenbroker furnishing plaintiff's brokerage statement and stock certificate.[6]  The stock certificate showed that plaintiff was a stockholder of record.  As a result, the Company's own books and records showed that plaintiff was a stockholder at all relevant times.  While it supplied the requested information, the letter challenged how or why plaintiff's stock ownership history would "'facilitate the Board's consideration of [the] demand,'" noting that the wrongdoing detailed in therein "has nothing to do with [plaintiff], let alone his transaction history in Intelligent Systems stock."

143.    Kistenbroker responded in a letter dated September 12, 2019, complaining that plaintiff's stock certificate did not prove continuous stock ownership.[7]  In the letter, he correctly

---

[6] A true and correct copy of the letter dated September 3, 2019, is attached hereto as Exhibit C.

[7] A true and correct copy of the letter dated September 12, 2019, is attached hereto as Exhibit D.

mentioned that Georgia law requires this proof to *commence* a derivative proceeding, but incorrectly conflated the requirement as a prerequisite for the Board to consider a litigation demand.  With this incorrect interpretation of the law, Kistenbroker once again asked for proof that plaintiff continuously owned stock throughout the wrongdoing detailed in his Demand, or, alternatively, an attestation from his counsel that this was true.

144.    On September 17, 2019, plaintiff's counsel responded to Kistenbroker attesting that plaintiff continuously owned stock while pointing out that the Company could easily see so for itself.[8]  In particular, plaintiff's counsel wrote that plaintiff's stock certificate provided in the previous letter shows he is a stockholder of record and because Intelligent Systems only had 204 stockholders of record, Intelligent Systems' "own internal records would show his continuous stock ownership."

145.    Georgia law allows stockholders to commence derivative proceedings once ninety days have expired from the date the demand was made, unless they have already received notice that the company rejected the demand.  O.C.G.A. §14-2-742.  Over seven months have passed since the date the Demand was made, yet the Board has failed to respond.  Accordingly, plaintiff has satisfied Georgia's demand requirement, and may pursue this action on behalf of the Company.

## COUNT I

### Against Defendants Strange, Moise, Petit, Fuzzell, and Chandler for
### Violation of Section 14(a) of the Exchange Act

146.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

---

[8] A true and correct copy of the letter dated September 17, 2019, is attached hereto as Exhibit E.

147.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants Strange, Moise, Petit, Fuzzell, and Chandler. The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

148.    Defendants Strange, Moise, Petit, Fuzzell, and Chandler negligently issued, caused to be issued, and participated in the issuance of the materially misleading written statements to stockholders which were contained in the 2017 Proxy and 2018 Proxy (collectively, the "Proxies").   In the Proxies, the Board solicited stockholder votes to reelect certain directors to the Board.  The Proxies, however, misrepresented and failed to disclose: (i) defendant Petit's pattern of fraudulent conduct and other wrongdoing; (ii) defendant Petit's independence and ties to defendant Strange; and (iii) the independence of the Company's independent auditor and defendant Strange's relationship with Nichols Cauley.  By reasons of the conduct alleged herein, defendants Strange, Moise, Petit, Fuzzell, and Chandler violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Intelligent Systems misled and/or deceived its stockholders by making misleading statements that were essential links in the stockholders heeding to Intelligent Systems' recommendation to reelect defendants Petit and Strange to the Board.

149.    The misleading information contained in the Proxies was material to Intelligent Systems' stockholders in determining whether or not to elect these defendants.  This information was also material to the integrity of the directors that were proposed for reelection to the Board. The proxy solicitation processes in connection with the Proxies were essential links in the

reelection of the nominees to the Board.

150.     Plaintiff, on behalf of Intelligent Systems, thereby seeks relief for damages inflicted upon the Company based on the misleading Proxies in connection with the improper reelection of the members of the Board.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

151.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.     The Individual Defendants owed and owe Intelligent Systems fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Intelligent Systems the highest obligation of good faith, fair dealing, loyalty, and due care.

153.     The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Intelligent Systems, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

154.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) defendant Petit engaged in pervasive accounting fraud, mismanagement, and other violations of law at companies he was involved with; (ii) defendants Petit and Strange had a personal relationship and engaged in undisclosed related-party transactions; (iii) defendant Strange had an undisclosed personal relationship with the Company's auditor; (iv) the Company had undisclosed

related-party transactions; and (v) as a result of the foregoing, Intelligent Systems' representations concerning its management, business operations, and future prospects were improper.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

155.    The Director Defendants, as directors of the Company, owed Intelligent Systems the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity detailed herein.  The Director Defendants knew or were reckless in not knowing that: (i) defendant Petit engaged in pervasive accounting fraud, mismanagement, and other violations of law at companies he was involved with; (ii) defendants Petit and Strange had a personal relationship and engaged in undisclosed related-party transactions; (iii) defendant Strange had an undisclosed personal relationship with the Company's auditor; (iv) the Company had undisclosed related-party transactions; and (v) as a result of the foregoing, Intelligent Systems' representations concerning its management, business operations, and future prospects were improper.  Accordingly, these defendants breached their duty of loyalty to the Company.

156.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

157.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Intelligent Systems has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

158.    Plaintiff, on behalf of Intelligent Systems, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Waste of Corporate Assets

159.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160.    As a result of the wrongdoing detailed herein, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Securities Class Action that they brought on with their improper statements.

161.    As a result of their failure to conduct proper supervision, the Individual Defendants have caused Intelligent Systems to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

162.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

163.    Plaintiff, on behalf of Intelligent Systems, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

164.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

165.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Intelligent Systems.   The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Intelligent Systems.

166.    Plaintiff, as a stockholder and representative of Intelligent Systems, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

167.    Plaintiff, on behalf of Intelligent Systems, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Intelligent Systems, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.    Directing Intelligent Systems to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Intelligent Systems and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.    a proposal to expand the number of directors, and specifically independent directors, to the Company's Board;

2.    a proposal requiring each director to stand for reelection at the Company's Annual Meeting of Shareholders;

3.    a proposal preventing the CEO from concurrently serving as a director of the Company;

4.    a proposal to strengthen the Company's controls over financial reporting;

5.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

6.      a provision to permit the stockholders of Intelligent Systems to nominate at least three candidates for election to the Board; and

7.      a proposal to strengthen Intelligent Systems' oversight of its disclosure procedures;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Intelligent Systems has an effective remedy;

D.      Awarding to Intelligent Systems restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

### **JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: February 14, 2020

LAW OFFICES OF THOMAS G. AMON

THOMAS G. AMON

420 Lexington Avenue, Suite 1402

New York, NY 10170
Telephone: (212) 810-2430
E-mail: tamon@amonlaw.com

ROBBINS LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
STEVEN R. WEDEKING
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
        csmith@robbinsllp.com
        swedeking@robbinsllp.com

RM LAW, P.C.
RICHARD A. MANISKAS
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
Telephone: (484) 324-6800
Facsimile:  (484) 631-1305
E-mail: rmaniskas@rmclasslaw.com

Attorneys for Plaintiff

1427579

## **VERIFICATION**

I, George Assad, hereby declare as follows:

I am the plaintiff in this action. I have read the verified stockholder derivative complaint. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _02/13/2020_

GEORGE ASSAD